**IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION**

DAVID SMITH, *et al.*                                                         PLAINTIFFS

v.                                          No. 4:09CV00679 JLH

FRAC TECH SERVICES, LLC                                          DEFENDANT

### OPINION AND ORDER

This is a Fair Labor Standards Act collective action with fifty-six plaintiffs and nearly as

many pending motions.  With apologies to the parties for allowing some of the motions to linger too

long, the Court, in this Opinion and Order, will decide all of them.

## I.  INTRODUCTION

Frac Tech Services, LLC, a Texas limited liability corporation,[1] engages in oil and gas well

stimulation using hydraulic fracturing.  It operates in at least ten districts in various locations in the

United States.  The plaintiffs are current or former employees of Frac Tech.  All of them were paid

a salary rather than an hourly wage.  They allege that their hours fluctuated from week to week and

ranged from 75 hours per week to 120 hours per week.  None of them was paid overtime.  All of

them allege that Frac Tech engaged in a common practice, policy, or plan of refusing to compensate

all hours worked and refusing to pay overtime.[2]  Frac Tech contends that all of the plaintiffs are

exempt from the overtime requirements of the FLSA, under one or more of the exemptions provided

---

[1] The named defendant is Frac Tech Services, Ltd.  The defendant's answer to the Fifth
Amended and Substituted Complaint says that the defendant's proper name is Frac Tech
Services, LLC, which is a foreign limited liability company organized under the laws of Texas.
The Clerk is directed to correct the defendant's name on the docket.

[2] Individual plaintiffs David Smith, Alan Sheedy, Eric Jimerson, and Marcus Thomas also
allege that Frac Tech engaged in retaliatory conduct against them in violation of
section 215(a)(3) of Title 29 of the United States Code.

in section 213 of Title 29 of the United States Code. The plaintiffs contend that Frac Tech misclassified them as exempt employees. The parties agree that Frac Tech's liability under the FLSA turns on whether the plaintiffs are exempt under one or more of the exemptions contained in section 213.

## A.   PROCEDURAL HISTORY

Initially, David Smith and Adam Sheedy, who were employed by Frac Tech as service supervisors, brought this action "on behalf of [themselves] and on behalf of all other Frac Tech employees, whether past, present or future, who are classified as salaried employees but in reality are or will be non-exempt from the overtime requirements of the Fair Labor Standards Act." Document #1, Compl. ¶ 1. The plaintiffs subsequently filed a second amended complaint adding an additional eighteen named plaintiffs, including twelve additional service supervisors, three field coordinators, and three field engineers. A third amended complaint named more service supervisors, field coordinators, and field engineers as named plaintiffs. Shortly after the third amended complaint was filed, the Court granted initial certification to the class of service supervisors, pursuant to section 216(b) of Title 20 of the United States Code, allowing the named plaintiffs to provide notice and the opportunity to opt into the action to other similarly situated service supervisors. *Smith v. Frac Tech Servs., Ltd.*, No. 4:09CV00679, 2009 WL 4251017, at *7-8 (E.D. Ark. Nov. 24, 2009). Next, a fourth amended complaint was filed adding a large number of named plaintiffs including a safety coordinator; health, safety and environment manager; facility manager; and electronics manager. Thereafter, the Court granted initial certification to the class of field engineers. *Smith v. Frac Tech Servs., Ltd.*, No. 4:09CV00679, 2010 WL 743296, at *4 (E.D. Ark. Feb. 26, 2010). Some months

later, the Court granted permission for the plaintiffs to file a fifth amended complaint.[3]  The fifth amended complaint added a number of named plaintiffs but no new categories of employee positions.

Once discovery closed, both sides filed a slew of motions.  Some of the motions were uncontested and reduced the number of plaintiffs.[4]  Fifty-six plaintiffs are still standing, all of whom are named as plaintiffs in the fifth amended complaint.  The class of service supervisors has thirty-nine members.  There are fourteen members in the class of field engineers.  Nine plaintiffs have individual claims as field coordinators.[5]

Frac Tech moves the Court to decertify the service supervisor class and sever the resulting individual actions.  In the alternative, Frac Tech moves for partial summary judgment on the issue of whether the class of service supervisors is exempt from the overtime requirements of the FLSA.  The plaintiffs also move for partial summary judgment on the issue of whether the class of service supervisors is exempt from the overtime requirements of the FLSA.

Frac Tech also moves to decertify the field engineer class and sever the resulting individual actions.  The plaintiffs move for partial summary judgment as to the field engineers.

_____

[3] In the same order, the Court dismissed, without prejudice, a number of plaintiffs.

[4] The Court dismissed Jason Sanderfer; Brandon Smith; Robert Pulse, the electronics manager; Richard Pearson, the facility manager; and Claiborne Lee, the health, safety and environment manager, from the action.  Additionally, the Court granted summary judgment in Frac Tech's favor as to the claims of Brady Borden in his capacity as a safety coordinator.  Hence, all remaining claims are brought by the plaintiffs in their capacities as service supervisors, field coordinators, or field engineers.

[5] Five plaintiffs have claims as both service supervisors and field coordinators, and one of them also has a claim as a field engineer.  Although Jeffery Martinez is identified in the fifth amended complaint as a service supervisor, the parties have treated him as a field coordinator in the motions for summary judgment, so the Court will treat him as such.  *See infra* pp. 53-65.

Frac Tech has moved for partial summary judgment as to whether David Dunn and Chris Giles as field coordinators are exempt from the overtime requirements of the FLSA.  The plaintiffs have moved for partial summary judgment as to whether Patrick Berry, Jeff Davis, Chris Giles, Ken Martineau, and Jeffery Martinez  as field coordinators are exempt from the overtime requirements of the FLSA.

Frac Tech moves for partial summary judgment asking the Court to rule as a matter of law that the fluctuating work week method of calculating damages is to be used to determine the amount of unpaid overtime compensation owed in the event Frac Tech is found liable to any of the plaintiffs under sections 203 and 207 of the FLSA.  The plaintiffs have also filed a motion in limine and a motion to compel.  The defendants have filed a motion to strike certain exhibits.

For the reasons explained below, Frac Tech's motion to decertify the class of service supervisors will be granted.  As a result, both Frac Tech's and the plaintiffs' motions for summary judgment as to the service supervisors will be denied as moot.  Frac Tech's motion to decertify the class of field engineers will be denied.  The plaintiffs' motion for partial summary judgment as to the field engineers will be granted on the issue of whether field engineers are exempt from the overtime requirements of the FLSA and denied on the issue of whether Frac Tech's violation of the FLSA was willful.  Frac Tech's motion for partial summary judgment as to whether David Dunn as field coordinator is exempt from the overtime requirements of the FLSA will be denied.  Frac Tech's motion for partial summary judgment as to whether Chris Giles as field coordinator is exempt from the overtime requirements of the FLSA will be granted.  The plaintiffs' motion for partial summary judgment as to whether Patrick Berry, Jeff Davis, Ken Martineau, and Jeffery Martinez as field

coordinators are exempt from the overtime requirements of the FLSA will be denied as to the executive exemption but granted as to all other exemptions.

Frac Tech's motion for partial summary judgment regarding the application of the fluctuating work week method will be granted. Frac Tech's motion to sever will be denied pending a Rule 16 conference to discuss case management. The plaintiffs' motion in limine will be granted in part and denied in part. Finally, the plaintiffs' motion to compel will be denied as moot.

## B.  LEGAL STANDARDS: DECERTIFICATION

The FLSA authorizes similarly situated employees to proceed collectively to recover damages for violations of the FLSA's overtime and recordkeeping provisions. 29 U.S.C. § 216(b) (2006). "These collective actions are intended to serve the interests of judicial economy and to aid in the vindication of plaintiffs' rights." *In re Pilgrim's Pride FLSA Litig.*, No. 1:07CV01832, 2008 WL 4877239, at *2 (W.D. Ark. Mar. 13, 2008) (citing *Hofmann-La Roche Inc. v. Sperling*, 493 U.S. 165, 110 S. Ct. 482, 107 L. Ed. 2d 480 (1989)).

As explained in the Court's prior opinion certifying the class of service supervisors, most district courts in the Eighth Circuit use a two-step process for certifying a class to proceed as a collective action. *Frac Tech*, 2009 WL 4251017, at *1. Adopting this approach, the Court granted the plaintiffs' motions for collective actions at the notice stage and authorized notice to potential class members of the opportunity to "opt-in" to the action. *Id.* at 7-8; *Frac Tech*, 2010 WL 743296, at *4. Now that discovery is complete, Frac Tech has moved for decertification, thereby triggering the second stage of the certification process. *See Helmert v. Butterball, LLC*, No. 4:08CV00342 JLH, 2009 WL 5066759, at *6 (E.D. Ark. Dec. 15, 2009) ("[T]he opt-in stage analysis, which typically follows a motion to decertify, places the burden of proof on the defendant . . ."). "To

maintain an opt-in class action[, the plaintiffs] bear the burden to show that they are similarly situated with respect to their job requirements and pay provisions." *Id.*; *see also Grayson v. K Mart Corp.*, 79 F.3d 1086, 1096 (11th Cir. 1996).

At the notice stage, this burden was lenient. *See Frac Tech*, 2009 WL 4251017, at *4 (citing *Freeman v. Wal-Mart Stores, Inc.*, 256 F. Supp. 2d 941, 945 (W.D. Ark. 2003)). However, at the second stage, the court applies a stricter standard and must make a factual determination regarding whether the putative class members are similarly situated. *Ford v. Townsends of Ark., Inc.*, No. 4:08CV00509, 2010 WL 1433455, at *3 (E.D. Ark. Apr. 9, 2010) ("The court then uses a stricter standard to determine whether the putative class members are similarly situated and whether the trial should proceed collectively."). "Courts will consider three factors at this second stage: (1) the employment and factual settings of the plaintiffs; (2) the various defenses available to the defendants; and (3) considerations of fairness, procedure, and manageability." *Id.* (quoting *Helmert*, 2009 WL 5066759, at *3). Of course, to "be similarly situated, . . . class members need not be identically situated." *Kautsch v. Premier Commc'ns*, 504 F. Supp. 2d 685, 690 (W.D. Mo. 2007).

## C.   LEGAL STANDARDS: SUMMARY JUDGMENT

A court should enter summary judgment if the evidence, viewed in the light most favorable to the nonmoving party, demonstrates that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S. Ct. 2505, 2511, 91 L. Ed. 2d 202 (1986); *Cheshewalla v. Rand & Son Constr. Co.*, 415 F.3d 847, 850 (8th Cir. 2005). The party moving for summary judgment bears the initial responsibility of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 2553, 91 L. Ed. 2d 265 (1986).

If the moving party carries its burden, the nonmoving party must "come forward with 'specific facts showing that there is a *genuine issue for trial*.'"  *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587, 106 S. Ct. 1348, 1356, 89 L. Ed. 2d 538 (1985) (quoting FED. R. CIV. P. 56(e)) (emphasis in original).  A genuine issue for trial exists only if there is sufficient evidence to allow a jury to return a verdict for the nonmoving party.  *Anderson*, 477 U.S. at 249, 106 S. Ct. at 2511.  When a nonmoving party cannot make an adequate showing on a necessary element of the case on which that party bears the burden of proof, the moving party is entitled to judgment as a matter of law.  *Celotex*, 477 U.S. at 322, 106 S. Ct. at 2552.

**D.    LEGAL STANDARDS: THE EXECUTIVE EXEMPTION**

At issue in a number of the motions addressed in this order is whether the executive exemption to the FLSA's overtime requirements apply to the plaintiffs.  *See* 29 U.S.C. § 213(a)(1).  As a general rule, "the application of an exemption under the Fair Labor Standards Act is a matter of affirmative defense on which the employer has the burden of proof."  *Hertz v. Woodbury Cnty., Iowa*, 566 F.3d 775, 783 (8th Cir. 2009) (quoting *Corning Glass Works v. Brennan*, 417 U.S. 188, 196-97, 94 S. Ct. 2223, 2229, 41 L. Ed. 2d 1 (1974)).  Further, "[w]hile the Court does not consider the merits of Plaintiffs' claims on a decertification motion, understanding the FLSA standards regarding the ultimate determination of exempt status is necessary in order to determine whether Plaintiffs are similarly situated in relevant respects."  *Smith v. Heartland Auto. Servs., Inc.*, 404 F. Supp. 2d 1144, 1148 (D. Minn. 2005).

For purposes of the FLSA, an executive is an employee

(1) Compensated on a salary basis at a rate of not less than $455 per week (or $380 per week, if employed in American Samoa by employers other than the Federal Government), exclusive of board, lodging or other facilities;

(2) Whose primary duty is management of the enterprise in which the employee is employed or of a customarily recognized department or subdivision thereof;

(3) Who customarily and regularly directs the work of two or more other employees; and

(4) Who has the authority to hire or fire other employees or whose suggestions and recommendations as to the hiring, firing, advancement, promotion or any other change of status of other employees are given particular weight.

29 C.F.R. § 541.100(a) (2010).  The term "management"

includes, but is not limited to, activities such as interviewing, selecting, and training of employees; setting and adjusting their rates of pay and hours of work; directing the work of employees; maintaining production or sales records for use in supervision or control; appraising employees' productivity and efficiency for the purpose of recommending promotions or other changes in status; handling employee complaints and grievances; disciplining employees; planning the work; determining the techniques to be used; apportioning the work among the employees; determining the type of materials, supplies, machinery, equipment or tools to be used or merchandise to be bought, stocked and sold; controlling the flow and distribution of materials or merchandise and supplies; providing for the safety and security of the employees or the property; planning and controlling the budget; and monitoring or implementing legal compliance measures.

29 C.F.R. § 541.102.  "Determination of an employee's primary duty must be based on all the facts

in a particular case, with the major emphasis on the character of the employee's job as a whole."

29 C.F.R. § 541.700(a).  Factors to consider include

the relative importance of the exempt duties as compared with other types of duties; the amount of time spent performing exempt work; the employee's relative freedom from direct supervision; and the relationship between the employee's salary and the wages paid to other employees for the kind of nonexempt work performed by the employee.

*Id.*; *see also Auer v. Robbins*, 65 F.3d 702, 712 (8th Cir. 1995).  "[E]mployees who spend more than

50 percent of their time performing exempt work will generally satisfy the primary duty

requirement." 29 C.F.R. § 541.700(b).  Of course, "[t]ime alone, . . . is not the sole test, and nothing

in [the FLSA] requires that exempt employees spend more than 50 percent of their time performing

exempt work." *Id.*  Rather, "[e]mployees who do not spend more than 50 percent of their time performing exempt duties may nonetheless meet the primary duty requirement if the other factors support such a conclusion." *Id.*  Finally, "applying the executive exemption is 'an inherently fact-based inquiry' that depends on the many details of the particular job duties and actual work performed by the employee seeking overtime pay." *Morgan v. Family Dollar Stores, Inc.*, 551 F.3d 1233, 1263 (11th Cir. 2008).

"The phrase 'two or more other employees' means two full-time employees or their equivalent." 29 C.F.R. § 541.104(a).  "The phrase 'customarily and regularly' means a frequency that must be greater than occasional but which, of course, may be less than constant.  Tasks or work performed 'customarily and regularly' includes work normally and recurrently performed every workweek; it does not include isolated or one-time tasks." 29 C.F.R. § 541.701.

"An employee's suggestions and recommendations may still be deemed to have 'particular weight' even if a higher level manager's recommendation has more importance and even if the employee does not have authority to make the ultimate decision as to the employee's change in status." 29 C.F.R. § 541.105.  Factors to consider include, but are not limited to, "whether it is part of the employee's job duties to make such suggestions and recommendations; the frequency with which such suggestions and recommendations are made or requested; and the frequency with which the employee's suggestions and recommendations are relied upon." *Id.*  Further, "an executive's suggestions and recommendations must pertain to employees whom the executive customarily and regularly directs.  It does not include an occasional suggestion with regard to the change in status of a co-worker." *Id.*

E.     LEGAL STANDARDS: THE ADMINISTRATIVE EXEMPTION

An employee also may be exempt from the FLSA's overtime requirements under the administrative exemption. *See* 29 U.S.C. § 213(a)(1). Generally, the administrative exemption applies to any employee

> (1) Compensated on a salary or fee basis at a rate of not less than $455 per week (or $380 per week, if employed in American Samoa by employers other than the Federal Government), exclusive of board, lodging or other facilities;
>
> (2) Whose primary duty is the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers; and
>
> (3) Whose primary duty includes the exercise of discretion and independent judgment with respect to matters of significance.

29 C.F.R. § 541.200(a).

The Code of Federal Regulations provides examples and guidance for analyzing the second element of this exemption:

> (a) To qualify for the administrative exemption, an employee's primary duty must be the performance of work directly related to the management or general business operations of the employer or the employer's customers. The phrase "directly related to the management or general business operations" refers to the type of work performed by the employee. To meet this requirement, an employee must perform work directly related to assisting with the running or servicing of the business, as distinguished, for example, from working on a manufacturing production line or selling a product in a retail or service establishment.
>
> (b) Work directly related to management or general business operations includes, but is not limited to, work in functional areas such as tax; finance; accounting; budgeting; auditing; insurance; quality control; purchasing; procurement; advertising; marketing; research; safety and health; personnel management; human resources; employee benefits; labor relations; public relations, government relations; computer network, internet and database administration; legal and regulatory compliance; and similar activities. Some of these activities may be performed by employees who also would qualify for another exemption.

(c) An employee may qualify for the administrative exemption if the employee's primary duty is the performance of work directly related to the management or general business operations of the employer's customers. Thus, for example, employees acting as advisers or consultants to their employer's clients or customers (as tax experts or financial consultants, for example) may be exempt.

29 C.F.R. § 541.201.

The final sentence of section 541.201(a) articulates a dichotomy between "administrative work" and "production work" whereby work that directly generates the product or service that the employer provides is "production work" falling outside of the administrative exemption. *Renfro v. Ind. Mich. Power Co.*, 370 F.3d 512, 517 (6th Cir. 2004).

## F.   LEGAL STANDARDS: THE PROFESSIONAL EXEMPTION

An employee may be exempt from the FLSA's overtime requirements under the professional exemption as well. *See* 29 U.S.C. § 213(a)(1). Generally, the professional exemption applies to any employee

> (1) Compensated on a salary or fee basis at a rate of not less than $455 per week (or $380 per week, if employed in American Samoa by employers other than the Federal Government), exclusive of board, lodging, or other facilities; and
>
> (2) Whose primary duty is the performance of work:
>
> (i) Requiring knowledge of an advanced type in a field of science or learning customarily acquired by a prolonged course of specialized intellectual instruction; or
>
> (ii) Requiring invention, imagination, originality or talent in a recognized field of artistic or creative endeavor.

29 C.F.R. § 541.300(a). Subsection (2)(i) describes the "learned professional exemption," section, while subsection (2)(ii) describes the "creative professional exemption." *See* 29 C.F.R. §§ 541.301-302. Only the learned professional exemption is at issue in this case.

To qualify for the learned professional exemption, an employee's primary duty must satisfy three elements:

(1) The employee must perform work requiring advanced knowledge;

(2) The advanced knowledge must be in a field of science or learning; and

(3) The advanced knowledge must be customarily acquired by a prolonged course of specialized intellectual instruction.

29 C.F.R. § 541.301(a). The third element "restricts the exemption to professions where specialized academic training is a standard prerequisite for entrance into the profession." 29 C.F.R. § 541.301(d). "The best prima facie evidence that an employee meets this requirement is possession of the appropriate academic degree." *Id.* The term "customarily" is designed to include the occasional professional "who attained the advanced knowledge through a combination of work experience and intellectual instruction[,]" but did not actually obtain the specific degree. *Id.* "The learned professional exemption . . . does not apply to occupations in which most employees have acquired their skill by experience rather than by advanced specialized intellectual instruction." *Id.*; *see also Young v. Cooper Cameron Corp.*, 586 F.3d 201, 206 (2d Cir. 2009) ("But where most or all employees in a particular job lack advanced education and instruction, the exemption is inapplicable . . . ."). Further, the exemption does not apply to "occupations that customarily may be performed with only the general knowledge acquired by an academic degree in any field [or] with knowledge acquired through an apprenticeship . . . ." 29 C.F.R. § 541.301(d).

## II.  MOTIONS REGARDING THE CLASS OF SERVICE SUPERVISORS

Frac Tech has moved to decertify the class of service supervisors and, in the alternative, for summary judgment as to whether the class of service supervisors is exempt from the overtime requirements of the FLSA. The plaintiffs also have moved for summary judgment as to the class of

service supervisors, asking the Court to find as a matter of law that they are not exempt from the overtime requirements of the FLSA.

## A.     FRAC TECH'S MOTION TO DECERTIFY THE CLASS OF SERVICE SUPERVISORS

Frac Tech contends that discovery has revealed numerous differences between the service supervisor plaintiffs significant to the various elements of the executive exemption and, therefore, that the class should be decertified. The plaintiffs contend that these differences are not sufficiently significant to warrant decertification.

### 1.     <u>The Evidence</u>

It is uncontested that the plaintiffs are similarly situated with respect to the first element inasmuch as all of the plaintiffs were paid more than $455 per week.[6] However, Frac Tech asserts that discovery has revealed substantial variation in the duties of the individual service supervisors which are relevant to the other three elements of the executive exemption. Further, Frac Tech points to differences in duties identified as "management" duties in the regulations.

Some service supervisors testified that they conducted interviews or made recommendations regarding potential employees. Document #262-33, Ex. CC, R.J. Lopez Dep. 83:7-10, July 9, 2010; Document #262-45, Ex. RR, Sergio Vinoles Dep. 84:22-24, 85:12-15, June 24, 2010; Document #262-13, Ex. L, Carlos Garza Dep. 13:1-21, July 9, 2010; Document #262-10, Ex. I, David Dunn Dep. 55:21-25, August 23, 2010.[7] Many service supervisors, in contrast, testified that they did not

---

[6] The various plaintiffs were paid salaries ranging from approximately $5,600 per month to approximately $8,000 per month, so the first element is not an issue with respect to any plaintiff on any exemption.

[7] It is unclear whether Sergio Vinoles was acting as a service supervisor or yard manager at the time he conducted the interviews. Document #262-45, Ex. RR, Vinoles Dep. 51:2-16, 85:1-7. The plaintiffs contend that R.J. Lopez only conducted interviews because he was given

conduct interviews or were not involved in the hiring process.  Document #262-6, Ex. E, Cory Byrd Dep. 36:2-3, July 7, 2010;  Document #262-14, Ex. M, Marc Geer Dep. 54:2-4, June 28, 2010; Document #262-26, Ex. Y, Eric Jimerson Dep. 215:2-7, July 29, 2010; Document #262-29, Ex. BB, Wesley Kelley Dep. vol. 2, 29:3-6, June 29, 2010; Document #262-19, Ex. R, Douglas Guiley Dep. 66:1-3, August 27, 2010; Document #262-25, Ex. X, Desmon Jackson Dep. 138:25-139:5, July 21, 2010; Document #262-37, Ex. JJ, Margarito Ruiz Dep. 85:9-11, July 21, 2010; Document #262-7, Ex. F, Rory Caffrey Dep. 70:6-9, August 4, 2010; Document #262-35, Ex. HH, Travis Roundtree Dep. 140:1, August 2, 2010; Document #262-36, Ex. II, Jeff Rowe Dep. 85:22-24, 86:23-25, July 29, 2010.

Many service supervisors stated that they informally trained employees on the job. Document #262-8, Ex. G, Jerimie Coffman Dep. 63:14-16, August 16, 2010; Document #262-6, Ex. E, Byrd Dep. 45:22-24; Document #262-14, Ex. M, M. Geer Dep. 79:1-2, 85:22-25; Document #262-26, Ex. Y, Jimerson Dep. 215:11-14; Document #262-29, Ex. BB, Kelly Dep. vol. 2, 29:15-18; Document #262-36, Ex. II, Rowe Dep. 87:9-11; Document #262-19, Ex. R, Guiley Dep. 66:12-20; Document #262-35, Ex. HH, Roundtree Dep. 158:11-15; Document #262-4, Ex. C, Josh Borden Dep. 125:24-25, August 16, 2010; Document #262-21, Ex. T, Eduardo Hernandez Dep. 46:5-12, July 15, 2010.  Others testified that they merely paired experienced employees with novice ones. Document #262-43, Ex. PP, Marcus Thomas Dep. 92:2-8, August 11, 2010; Document #262-38, Ex. KK, Gregory Shaw Dep. 105, July 28, 2010; Document #262-31, Ex. DD, Mark Mabry Dep. 23:8-

---

additional duties beyond the normal ones of a service supervisor.  Nevertheless, the plaintiffs do not deny that Mr. Lopez was a service supervisor when he conducted these interviews.  Mr. Vinoles also stated that he hired equipment operators, but again it is unclear whether he did this in his capacity as a service supervisor or as a yard manager.  Document #262-45, Ex. RR, Vinoles Dep. 85:8-9.

18, August 4, 2010.  In contrast, two service supervisors testified that they never trained employees. Document #262-13, Ex. L, Garza Dep. 14:2-8; Document #262-25, Ex. X, Jackson Dep. 139:6-18.

Some service supervisors testified that they had nothing to do with time off or vacation requests.  Document #262-31, Ex. DD, Mabry Dep. 46:20-47:4; Document #262-36, Ex. II, Rowe Dep. 86:13-14; Document #262-17, Ex. P, Gregory Lee Gibson Dep. 69:25-70:11, July 28, 2010; Document #262-21, Ex. T, E. Hernandez Dep. 48:7-10; Document #262-22, Ex. U, Martin Hernandez Dep. 56:21-57:1, August 18, 2010; Document #262-43, Ex. PP, Thomas Dep. 30:25-31:5.  Others stated that they were occasionally involved in processing such requests either by submitting them to the operations supervisor, by signing them before submitting them, or even by providing an initial approval or denial.  Document #262-41, Ex. NN, David Smith Dep. 64:1-9, July 14, 2010; Document #262-24, Ex. W, Waylon Hunt Dep. 41:4-12, June 24, 2010; Document #262-14, Ex. MM, Adam Sheedy Dep. 134:5-18, July 13, 2010; Document #262-29, Ex. BB, Kelly Dep. vol. 2, 47:19-48:4; Document #262-7, Ex. F, Caffrey Dep. 70:14-25; Document #262-4, Ex. C, Brady Borden Dep. 46:9-47:9, August 16, 2010; Document #262-13, Ex. LL, Essick Shead Dep. 23:4-24:5, July 15, 2010; Document #262-38, Ex. KK, Shaw Dep. 50; Document #262-25, Ex. X, Jackson Dep. 38:8-18, 116:1-20, 138:19-24; Document #262-37, Ex. JJ, Ruiz Dep. 43:16-25; Document #262-44, Ex. QQ, Jared Tucker Dep. 50:8-51:8, June 25, 2010; Document #262-10, Ex. I, Dunn Dep. 58:10-25; Document #262-2, Ex. A, Tejan Adams Dep. 39:2-25, 43:1-25, June 25, 2010.

Some service supervisors testified that they set the time for the crews to arrive at work—though their decision could be overruled by their supervisors—or advised their supervisors regarding the decision.  Document #262-18, Ex. Q, Christopher Giles Dep. 13:16-18, August 25,

2010; Document #262-4, Ex. C, B. Borden Dep. 33:17-25; Document #262-10, Ex. I, Dunn Dep. 23:1-2; Document #262-21, Ex. T, E. Hernandez Dep. 13:11-17; Document #262-22, Ex. U, M. Hernandez Dep. 11:4-5; Document #262-7, Ex. F, Caffrey Dep. 16:11-13; Document #262-14, Ex. MM, Sheedy Dep. 12:17-21, 33:3-34:4 (testifying that in the Longview and Conway districts the operations manager or district manager set the yard time, but in the Parachute district the service supervisors set the yard time); Document #262-44, Ex. QQ, Tucker Dep. 88:4-9; Document #262-31, Ex. DD, Mabry Dep. 14:16-20; Document #262-5, Ex. D, J. Borden Dep. 20:3-12; Document #262-8, Ex. G, Coffman Dep. 39:19-25; Document #262-35, Ex. HH, Roundtree Dep. 106:1-20; Document #262-13, Ex. LL, Shead Dep. 43:14-24; Document #262-27, Ex. Z, John Jolley Dep. 43:9-15. Other service supervisors testified that they did not set the arrival time. Document #262-38, Ex. KK, Shaw Dep. 116; Document #262-17, Ex. P, Gibson Dep. 52: 6-7; Document #262-25, Ex. X, Jackson Dep. 40:23-25; Document #262-8, Ex. GG, Jeffrey Ransom Dep. 38:5-6, August 20, 2010; Document #262-26, Ex. Y, Jimerson Dep. 35:6-8.

Some service supervisors reviewed employee time sheets. Document #262-14, Ex. MM, Sheedy Dep. 32:18-33:2; Document #262-2, Ex. A, Adams Dep. 32:1-14; Document #262-21, Ex. T, E. Hernandez Dep. 25:17-20. Other service supervisors testified that they did not monitor the time worked by the employees or have any responsibility regarding work hours. Document #262-17, Ex. P, Gibson Dep. 69:9-13; Document #262-4, Ex. CC, Lopez Dep. 28:1-14; Document #262-3, Ex. B, Dallas Bodily Dep. 100:9-11, June 29, 2010; Document #262-14, Ex. M, M. Geer Dep. 86:8-10; Document #262-26, Ex. Y, Jimerson Dep. 215:21-23; Document #262-19, Ex. R, Guiley Dep. 67:3-5; Document #262-35, Ex. HH, Roundtree Dep. 158:25-159:2; Document #262-36, Ex. II,

16

Rowe Dep. 87:15-17; Document #262-38, Ex. KK, Shaw Dep. 105; Document #262-25, Ex. X, Jackson Dep. 140:8-12.

Several service supervisors had the power to direct, manage, or supervise the Frac Tech crews, equipment, or job. Document #262-14, Ex. M, M. Geer Dep. 63:7-64:9; Document #262-14, Ex. MM, Sheedy Dep. 19:14-25, 37:15-22, 121:9-122:7; Document #262-41, Ex. NN, Smith Dep. 59:10-60:25, 62:1-21; Document #262-38, Ex. KK, Shaw Dep. 52; Document #262-10, Ex. I, Dunn Dep. 60:9-10; Document #262-4, Ex. C, B. Borden Dep.28:3-20; Document #262-26, Ex. Y, Jimerson Dep. 63:20-64:2; Document #262-43, Ex. PP, Thomas Dep. 97:17-98:15; Document #262-31, Ex. DD, Mabry Dep. 44:24-45:2; Document #262-17, Ex. P, Gibson Dep. 62:4-63:3; Document #262-25, Ex. X, Jackson Dep. 51:9-11; Document #262-9, Ex. H, Tiki Davis Dep. 40:16-22, June 23, 2010; Document #262-21, Ex. T, E Hernandez Dep. 43:22-44:6; Document #262-3, Ex. B, Bodily Dep. 56:2-17; Document #262-5, Ex. D, J. Borden Dep. 71:12-24. Others testified that they did not perform these management or supervisory functions. Document #262-36, Ex. II, Rowe Dep. 38:15-17 (stating that he was not responsible for the equipment and crew from the time it left the yard to when it returned); Document #262-26, Ex. Y, Jimerson Dep. 214:15-22; Document #262-29, Ex. BB, Kelly Dep. vol. 2, 25:15-26:2; Document #262-19, Ex. R, Guiley Dep. 64:5-20; Document #262-35, Ex. HH, Roundtree Dep. 157:18-23; Document #262-38, Ex. KK, Shaw Dep. 102 (stating that he did not manage workers and defining the term "manage" as the authority to hire, fire, give workers time off, or send workers home).

Some service supervisors testified that they could tell employees how to act or refrain from acting. Document #262-41, Ex. NN, Smith Dep. 159:3-13; Document #262-38, Ex. KK, Shaw Dep. 53-54; Document #262-5, Ex. D, J. Borden Dep. 40:11-16; Document #262-19, Ex. RR, Vinoles

Dep. 55:3-23; Document #262-35, Ex. HH, Roundtree Dep. 140:20-141:1; Document #262-19, Ex. R, Guiley Dep. 65:14-25.  One service supervisor said that he could not.  Document #262-36, Ex. II, Rowe Dep. 83:21-84:10.

Some service supervisors said that they were required to get the crew organized and ready to go out to the job site.  Document #262-17, Ex. P, Gibson Dep. 62:4-21; Document #262-14, Ex. MM, Sheedy Dep. 120:13-17; Document #262-3, Ex. B, Bodily Dep. 17:22-25.  Some said they set the convoy in order.  Document #262-43, Ex. PP, Thomas Dep. 22:20-23:4, 97:17-19; Document #262-5, Ex. D, J. Borden Dep. 26:17-27:20; Document #262-8, Ex. GG, Ransom Dep. 22:5-9; Document #262-37, Ex. JJ, Ruiz Dep. 35:24-36:18; Document #262-19, Ex. RR, Vinoles Dep. 25:19-24; Document #262-7, Ex. F, Caffrey Dep. 23:17-24; Document #262-14, Ex. M, M. Geer Dep. 35:21-22; Document #262-38, Ex. KK, Shaw Dep. 67; Document #262-24, Ex. W, Hunt Dep. 74:18-20.  Others said that they did not organize the convoy or set its order.  Document #262-29, Ex. BB, Kelly Dep. vol. 2, 6:15-7:15; Document #262-17, Ex. P, Gibson Dep. 58:12-22; Document #262-25, Ex. X, Jackson Dep. 44:11-17; Document #262-36, Ex. II, Rowe Dep. 35:17-18, 37:17-19.

Some service supervisors held convoy or safety meetings.  Document #262-3, Ex. B, Bodily Dep. 18:20-24; Document #262-7, Ex. F, Caffrey Dep. 24:12-15; Document #262-41, Ex. NN, Smith Dep. 37:23-25, 39:1-8; Document #262-14, Ex. M, M. Geer Dep. 37:2-9; Document #262-24, Ex. W, Hunt Dep. 74: 15-20; Document #262-43, Ex. PP, Thomas Dep. 21:8-23; Document #262-31, Ex. DD, Mabry Dep. 26:2-8; Document #262-19, Ex. R, Guiley Dep. 50:24-51:4; Document #262-38, Ex. KK, Shaw Dep. 61; Document #262-27, Ex. Z, Jolley Dep. 49:16-50:12; Document #262-37, Ex. JJ, Ruiz Dep. 35:12-14; Document #262-22, Ex. U, M. Hernandez Dep. 23:10; Document #262-10, Ex. I, Dunn Dep. 31:6-19.  Others said that they were not responsible for holding convoy

meetings.  Document #262-36, Ex. II, Rowe Dep. 37:12-14; Document #262-35, Ex. HH, Roundtree

Dep. 42:6-8; Document #262-13, Ex. L, Garza Dep. 17:10-13 (stating that he never personally held

a pre-trip safety meeting); Document #262-26, Ex. Y, Jimerson Dep. 38:17-18 (service supervisor

rarely held a convoy meeting); Document #262-13, Ex. LL, Shead Dep. 70:5-18 (stating that the

TCV operator, not the service supervisor, conducts a meeting).

Some testified that they had to assign operators to the various truck and equipment.

Document #262-44, Ex. QQ, Tucker Dep. 81:25-82:19; Document #262-38, Ex. KK, Shaw Dep.

110; Document #262-8, Ex. G, Coffman Dep. 46:14-18; Document #262-14, Ex. M, M. Geer Dep.

63:23-24, 64:6-9; Document #262-4, Ex. C, B. Borden Dep. 35:21-22; Document #262-41, Ex. NN,

Smith Dep. 68:2-14; Document #262-26, Ex. Y, Jimerson Dep. 21:3-4.  Others denied that they had

this duty.  Document #262-5, Ex. D, J Borden Dep. 25:25-26:16; Document #262-19, Ex. R, Guiley

Dep. 21:3-4 (stating that, as an equipment operator, he received his truck assignment from dispatch);

Document #262-27, Ex. Z, Jolley Dep. 38:24-39:3; Document #262-8, Ex. GG, Ransom Dep. 24:20-

23.

Some service supervisors testified that they were responsible for directing the process of

parking and setting up the equipment at the job site.  Document #262-14, Ex. MM, Sheedy Dep.

50:3-8; Document #262-3, Ex. B, Bodily Dep. 17:20-25; Document #262-41, Ex. NN, Smith Dep.

44:2-18; Document #262-7, Ex. F, Caffrey Dep. 29:2-8; Document #262-14, Ex. M, M. Geer Dep.

31:10-23; Document #262-24, Ex. W, Hunt Dep. 74:20-21; Document #262-26, Ex. Y, Jimerson

Dep. 160:13-16; Document #262-29, Ex. BB, Kelly Dep. vol. 2, 7:16-17; Document #262-43, Ex.

PP, Thomas Dep. 23:5-9; Document #262-44, Ex. QQ, Tucker Dep. 48:2-9; Document #262-38, Ex.

KK, Shaw Dep. 69-70; Document #262-23, Ex. V, Jimmy Huber Dep. 30:2-3, August 27, 2010.

Others said that they did not have this responsibility.  Document #262-36, Ex. II, Rowe Dep. 41:1-5; Document #262-25, Ex. X, Jackson Dep. 44:11-24.

Some service supervisors testified that after the job they held a crew meeting.  Document #262-37, Ex. JJ, Ruiz Dep. 30:23, 39:15-17; Document #262-26, Ex. Y, Jimerson Dep. 53:8-10; Document #262-3, Ex. B, Bodily Dep. 111:11-18; Document #262-19, Ex. R, Guiley Dep. 27:2-6; Document #262-38, Ex. KK, Shaw Dep. 74; Document #262-5, Ex. D, J. Borden 35:13-21; Document #262-4, Ex. C, B. Borden Dep. 34:2-3.  Others did not.   Document #262-25, Ex. X, Jackson Dep. 108:7-11; Document #262-35, Ex. HH, Roundtree Dep. 71:24-72:8; Document #262-13, Ex. LL, Shead Dep. 102:12-16; Document #262-14, Ex. MM, Sheedy Dep. 63:10-16 (service supervisor did not hold meeting but did attend it).

There is no evidence that any service supervisors could actually terminate an employee.  Some stated, however, that they could make recommendations regarding termination or admitted that they signed employee termination sheets.  Document #262-6, Ex. E, Byrd Dep. 20:5-12; Document #262-43, Ex. PP, Thomas Dep. 88:8-10; Document #262-10, Ex. I, Dunn Dep. 61:23-62:4; Document #262-27, Ex. Z, Jolley Dep. 66:16-21; Document #262-44, Ex. QQ, Tucker Dep. 89:6-90:10.   Others said that their job duties did not include making recommendations regarding termination. Document #262-5, Ex. D, J. Borden Dep. 127:7-19; Document #262-17, Ex. P, Gibson Dep. 68:24-69:3.

Several service supervisors testified that they filled out evaluation forms or conducted evaluations of employees, although some noted that they would only do this when their operations manager was absent.  Document #262-18, Ex. Q, Giles Dep. 23:3-5; Document #262-6, Ex. E, Byrd Dep. 15:4-10; Document #262-27, Ex. Z, Jolley Dep. 35:13-36:12; Document #262-7, Ex. F, Caffrey

Dep. 55:6-57:10; Document #262-14, Ex. M, M. Geer Dep. 52:24-53:8; Document #262-26, Ex. Y, Jimerson Dep. 57:4-58:18; Document #262-44, Ex. QQ, Tucker Dep. 52:8-54:22; Document #262-31, Ex. DD, Mabry Dep. 39:24-40:16; Document #262-2, Ex. A, Adams Dep. 73:21-75:10; Document #262-23, Ex. V, Huber Dep. 40:15-41:25; Document #262-22, Ex. U, M. Hernandez Dep. 48:4-6; Document #262-8, Ex. G, Coffman Dep. 38:14-39:14; Document #262-19, Ex. R, Guiley Dep. 68:11-14; Document #262-29, Ex. BB, Kelley Dep. vol 2, 26:14-24; Document #262-14, Ex. MM, Sheedy Dep. 69:12-17; Document #262-24, Ex. W, Hunt Dep. 43:5-24; Document #262-3, Ex. B, Bodily Dep. 65:15-66:25.  Others said that they never did evaluations.  Document #262-41, Ex. NN, Smith Dep. 66:14-17, 157:16-20; Document #262-36, Ex. II, Rowe Dep. 32:8-33:4; Document #262-25, Ex. X, Jackson Dep. 39:13-15; Document #262-37, Ex. JJ, Ruiz Dep. 43:14-15, 92:18-20; Document #262-13, Ex. L, Garza Dep. 14:9-14; Document #262-19, Ex. RR, Vinoles Dep. 51:21-52:2.

There was also widely varying testimony about what effect evaluations wrought.  Some service supervisors were unaware of what effect their evaluations had.  Byrd Dep. 21:4-7; Jimerson Dep. 58:19-21, 116:24-117:14; Guiley Dep. 67:15-23; J. Borden Dep. 42:23-43:3.  Some testified that merit increases were based on evaluations.  Shead Dep. 94:20-95:8; M. Geer Dep. 76:1-5; Adams Dep. 74:3-76:18; Dunn Dep. 69:18-70:14.  Others thought that raises did not depend on their evaluations.  Caffrey Dep. 66:2-8; Jolley Dep. 36:3-25; Huber Dep. 77:3-5.

Some service supervisors said that they never recommended employees for promotions or raises or were not asked for their opinions.  Document #262-3, Ex. B, Bodily Dep. 101:9-15; Document #262-26, Ex. Y, Jimerson Dep. 216:21-23; Document #262-19, Ex. R, Guiley Dep. 68:5-6; Document #262-35, Ex. HH, Roundtree Dep. 160:2-3; Document #262-36, Ex. II, Rowe Dep.

87:25-88:1; Document #262-5, Ex. D, J. Borden Dep. 126:23-24; Document #262-37, Ex. JJ, Ruiz Dep. 86:13-14; Document #262-21, Ex. T, E. Hernandez Dep. 48:24-49:3; Document #262-13, Ex. LL, Shead Dep. 89:10-12; Document #262-22, Ex. U, M. Hernandez Dep. 48:11-14; Document #262-43, Ex. PP, Thomas Dep. 77:2-7.  Others did recommend employees for promotions or raises. Document #262-29, Ex. BB, Kelley Dep. vol. 2, 25:20-22, 26:3-11; Document #262-44, Ex. QQ, Tucker Dep. 92:8-93:8; Document #262-24, Ex. W, Hunt Dep. 43:17-24; Document #262-4, Ex. CC, Lopez Dep. 99:7-9; Document #262-23, Ex. V, Huber Dep. 75:7-24.

Some service supervisors testified that they were not involved in employee discipline. Document #262-36, Ex. II, Rowe Dep. 32:12-13; Document #262-25, Ex. X, Jackson Dep. 39;16-19; Document #262-26, Ex. Y, Jimerson 59:11-24, 97:1-21; Document #262-3, Ex. B, Bodily Dep. 101:21-23.  Others said that they were not permitted to perform certain types of discipline, such as verbal or written discipline.  Document #262-38, Ex. KK, Shaw Dep. 140; Document #262-8, Ex. GG, Ransom Dep. 37:16-23; Document #262-6, Ex. E, Byrd Dep. 48:19-23; Document #262-4, Ex. CC, Lopez Dep. 69:19-22; Document #262-43, Ex. PP, Thomas Dep. 72:21-23; Document #262-3, Ex. B, Bodily Dep. 64:23-24; Document #262-18, Ex. Q, Giles Dep. 24:17-22.  Still others said that upon observing a problem, they consulted with a manager who would provide them with instructions or take over.  Document #262-17, Ex. P, Gibson Dep. 52:11-22; Document #262-4, Ex. CC, Lopez Dep. 69:14-24; Document #262-8, Ex. G, Coffman Dep. 50:4-10; Document #262-5, Ex. D, J. Borden Dep. 38:12-18.  Two service supervisors said that they could make recommendations about discipline.  Document #262-24, Ex. W, Hunt Dep. 30:8-23; Document #262-2, Ex. A, Adams Dep. 47:19-24.

Some service supervisors said that, on their own initiative, they had the authority to discipline employees verbally but, alone, could not do more.  Document #262-21, Ex. T, E. Hernandez Dep. 26:3-4, 28:6-9; Document #262-43, Ex. PP, Thomas Dep. 72:21-73:6; Document #262-31, Ex. DD, Mabry Dep. 32:7-17; Document #262-38, Ex. KK, Shaw Dep. 176.  Some said they could also issue written warnings.  Document #262-7, Ex. F, Caffrey Dep. 67:17-50:25; Document #262-4, Ex. C, B. Borden Dep. 48:15-50:1; Document #262-19, Ex. R, Guiley Dep. 34:21-24; Document #262-27, Ex. Z, Jolley Dep. 33:8-14; Document #262-22, Ex. U, M. Hernandez Dep. 50:3-20.  Others said they needed approval from a manager to write up an employee.  Document #262-36, Ex. II, Rowe Dep. 86:2-6; Document #262-38, Ex. KK, Shaw 48-49, 141, 176; Document #262-18, Ex. Q, Giles Dep. 24:21-22; Document #262-4, Ex. C, B. Borden Dep.23:13-14; Document #262-23, Ex. V, Huber Dep. 34:4-25; Document #262-8, Ex. GG, Ransom Dep. 29:11-13; Document #262-21, Ex. T, E. Hernandez Dep. 28:8-18; Document #262-8, Ex. G, Coffman Dep. 10:6-13.

Two service supervisors testified that they could not suspend an employee or put him on probation.  Document #262-8, Ex. GG, Ransom Dep. 29:21-30:2; Document #262-22, Ex. U, M. Hernandez Dep. 50:9-17.  Another said that he could give probation and time off without pay even without approval from his superiors.  Document #262-2, Ex. A, Adams Dep. 48:18-50:4.

Some service supervisors stated that they could remove an employee from the job, although some needed permission from a manager to do so.  Document #262-43, Ex. PP, Thomas Dep. 74:1-3; Document #262-22, Ex. U, M. Hernandez Dep. 33:20-24; Document #262-6, Ex. E, Byrd Dep. 46:5-12; Document #262-14, Ex. MM, Sheedy Dep. 138:18-24; Document #262-36, Ex. II, Rowe Dep. 86:7-12; Document #262-27, Ex. Z, Jolley Dep. 35:1-9; Document #262-4, Ex. CC, Lopez Dep. 114:23-115:8.  Other service supervisors testified that they could not order an employee off of the

location.   Document #262-26, Ex. Y, Jimerson Dep. 60:23-25;  Document #262-35, Ex. HH, Roundtree Dep. 143:4-7; Document #262-8, Ex. GG, Ransom Dep. 30:25-31:4; Document #262-21, Ex. T, E. Hernandez Dep. 48:13-17.

Some service supervisors stated that they were required to ensure the location or crew was prepared for the job.  Document #262-44, Ex. QQ, Tucker Dep. 36:21-37:4; Document #262-7, Ex. F, Caffrey Dep. 23:16-24; Document #262-27, Ex. Z, Jolley Dep. 51:4-25; Document #262-23, Ex. V, Huber Dep. 39:1-19; Document #262-31, Ex. DD, Mabry Dep. 44:10-16; Document #262-8, Ex. G, Coffman Dep. 30:22-25; Document #262-35, Ex. HH, Roundtree Dep. 59:20-23.  Others said that they had no responsibility for preparing the location before the convoy arrived.  Document #262-41, Ex. NN, Smith Dep. 37:21-25;  Document #262-43, Ex. PP, Thomas Dep. 95:15-97:8;  Document #262-18, Ex. Q, Giles Dep. 15:23-16:3;  Document #262-4, Ex. C, B. Borden Dep. 31:14-20; Document #262-17, Ex. P, Gibson Dep. 57:22-24;  Document #262-21, Ex. T, E. Hernandez Dep. 42:11-13.

Some service supervisors said that they make no recommendations regarding the fracturing job.  Document #262-43, Ex. PP, Thomas Dep. 97:9-13;  Document #262-38, Ex. KK, Shaw Dep. 75; Document #262-5, Ex. D, J. Borden Dep. 33:24-34:5; Document #262-25, Ex. X,  Jackson Dep. 56:24-57:3; Document #262-37, Ex. JJ, Ruiz Dep. 38:25-39:7; Document #262-19, Ex. RR, Vinoles Dep. 27:15-23;  Document #262-26, Ex. Y, Jimerson Dep. 68:6-17.  Others said that they would make recommendations about how the fracturing job should be carried out.  Document #262-23, Ex. V, Huber Dep. 88:17-20; Document #262-27, Ex. Z, Jolley Dep. 57:8-12; Document #262-16, Ex. O, Nicki Geer Dep. vol. 2, 20:2-21:1, June 29, 2010;  Document #262-41, Ex. NN, Smith Dep. 51:24-52:1; Document #262-3, Ex. B, Bodily Dep. 29:13-16.

Some service supervisors said that part of their supervisory duties involved ensuring employee safety. Document #262-27, Ex. Z, Jolley Dep. 74:1-6; Document #262-26, Ex. Y, Jimerson Dep. 63:22-64:8; Document #262-25, Ex. X, Jackson Dep. 137:22-138:13. Similarly, some service supervisors were expected to ensure that equipment was safely and properly loaded on the trucks. Document #262-24, Ex. W, Hunt Dep. 25:10-13; Document #262-23, Ex. V, Huber Dep. 71:20-72:16 (wrote up an employee for failing to secure his load); Document #262-8, Ex. GG, Ransom Dep. 41:14-17; Document #262-20, Ex. S, Peter Hanson Dep. 77:17-20, July 29, 2010; Document #262-27, Ex. Z, Jolley Dep. 49:21-50:6; Document #262-4, Ex. CC, Lopez Dep. 37:1-13. Others testified that they did not have this responsibility. Document #262-43, Ex. PP, Thomas Dep. 99:7-9; Document #262-36, Ex. II, Rowe Dep. 38:22-24; Document #262-5, Ex. D, J. Borden Dep. 25:9-12; Document #262-17, Ex. P, Gibson Dep. 67:7-10; Document #262-25, Ex. X, Jackson Dep. 43:16-21; Document #262-13, Ex. L, Garza Dep. 17:16-21; Document #262-35, Ex. HH, Roundtree Dep. 214:17-215:5; Document #262-3, Ex. B, Bodily Dep. 96:9-16.

Some service supervisors said that they did not ensure that pre-trip truck inspections or brake inspections were completed. Document #262-7, Ex. F, Caffrey Dep. 20:10-23:4; Document #262-26, Ex. Y, Jimerson Dep. 180:6-13; Document #262-36, Ex. II, Rowe Dep. 35:22-36:8; Document #262-5, Ex. D, J. Borden Dep. 24:18-22; Document #262-25, Ex. X, Jackson Dep. 45:1-13; Document #262-41, Ex. NN, Smith Dep. 40:4-6. Others said that they were responsible for ensuring these inspections occurred. Document #262-31, Ex. DD, Mabry Dep. 18:2-7; Document #262-19, Ex. R, Guiley Dep. 21:11-14, 51:21-23; Document #262-27, Ex. Z, Jolley Dep. 46:1-23; Document #262-21, Ex. T, E. Hernandez Dep. 21:6-22:5; Document #262-22, Ex. U, M. Hernandez Dep. 69:25-70:4; Document #262-14, Ex. MM, Sheedy Dep. 54:18-55:1.

Whether service supervisors had responsibility for leading the convoy and ensuring safe travel to the job site was also a matter concerning which the testimony varied. Some testified that they had this duty. Document #262-3, Ex. B, Bodily Dep. 21:22-23; Document #262-14, Ex. MM, Sheedy Dep. 32:5-9 (in Conway); Document #262-31, Ex. DD, Mabry Dep. 18:19-22; Document #262-10, Ex. I, Dunn Dep. 31:20-22; Document #262-17, Ex. P, Gibson Dep. 67:18-68:9; Document #262-37, Ex. JJ, Ruiz Dep. 36: 63:23-64:5; Document #262-22, Ex. U, M. Hernandez Dep. 24:8-10; Document #262-8, Ex. G, Coffman Dep. 46:25-47:6. Others said they did not lead the convoy. Document #262-36, Ex. II, Rowe Dep. 38:15-24; Document #262-8, Ex. GG, Ransom Dep. 26:25-27:18; Document #262-13, Ex. LL, Shead Dep. 69:15-70:2; Document #262-14, Ex. MM, Sheedy Dep. 30:1-10 (in Parachute).

Some service supervisors stated that they were responsible for ensuring that employees wore their personal protective equipment. Document #262-14, Ex. MM, Sheedy Dep. 52:17-20; Document #262-7, Ex. F, Caffrey Dep. 26:14-15; Document #262-43, Ex. PP, Thomas Dep. 21:16-23; Document #262-19, Ex. R, Guiley Dep. 51:12-14; Document #262-26, Ex. Y, Jimerson Dep. 41:14-17; Document #262-29, Ex. BB, Kelly Dep. vol. 2, 9:23-25; Document #262-22, Ex. U, M. Hernandez Dep. 74:14-17; Document #262-31, Ex. DD, Mabry Dep. 46:1-3; Document #262-17, Ex. P, Gibson Dep. 65:8-10. One said that he was not involved in ensuring that personal protective equipment was worn. Document #262-41, Ex. NN, Smith Dep. 39:12-15.

Some service supervisors said that they ensured compliance with Department of Transportation regulations. Document #262-43, Ex. PP, Thomas Dep. 21:16-20 (asked whether employees have their proper hours); Document #262-19, Ex. R, Guiley Dep. 21:15-18, 52:3-6; Document #262-27, Ex. Z, Jolley Dep. 48:1-14; Document #262-22, Ex. U, M. Hernandez Dep.

70:5-19; Document #262-7, Ex. F, Caffrey Dep. 27:13-21; Document #262-35, Ex. HH, Roundtree Dep. 124:7-25; Document #262-38, Ex. KK, Shaw Dep. 69; Document #262-8, Ex. GG, Ransom Dep. 46:16-22; Document #262-13, Ex. LL, Shead Dep. 43:16-18 (adjusted yard time to ensure that employees received ten hours off). Others said that they did not have this responsibility. Document #262-14, Ex. MM, Sheedy Dep. 55:6-14; Document #262-41, Ex. NN, Smith Dep. 40:7-12; Document #262-6, Ex. E, Byrd Dep. 40:12-15; Document #262-26, Ex. Y, Jimerson Dep. 39:13-19, 51:11-13; Document #262-36, Ex. II, Rowe Dep. 36:14-18; Document #262-5, Ex. D, J. Borden Dep. 28:4-8; Document #262-17, Ex. P, Gibson Dep. 60:3-10, 67:11-13; Document #262-23, Ex. V, Huber Dep. 28:10-12; Document #262-25, Ex. X, Jackson Dep. 43:22-44:3.

Testimony varied as to whether service supervisors were responsible for ensuring compliance with environmental laws. Some admitted that they were involved in ensuring compliance with environmental laws. Document #262-43, Ex. PP, Thomas Dep. 99:12-14; Document #262-31, Ex. DD, Mabry Dep. 46:16-19; Document #262-17, Ex. P, Gibson Dep. 68:10-12. Another said he was not. Document #262-13, Ex. LL, Shead Dep. 85:7-13.

Finally, recognizing that employees who engage in manual labor generally must be paid overtime, Frac Tech points to differences in the testimony as to the manual labor performed by service supervisors. Some service supervisors testified that they assisted in rigging the equipment. Document #262-41, Ex. NN, Smith Dep. 44:12-47:1; Document #262-36, Ex. II, Rowe Dep. 39:7-11, 85:3-5; Document #262-17, Ex. P, Gibson Dep. 64:14-65:3, 66:24-67:6; Document #262-13, Ex. L, Garza 18:1-24; Document #262-24, Ex. W, Hunt Dep. 75:5-16; Document #262-38, Ex. KK, Shaw Dep. 70. Others said they only occasionally assisted in rigging. Document #262-26, Ex. Y, Jimerson Dep. 42:3-7; Document #262-27, Ex. Z, Jolley Dep. 61:11-14; Document #262-13, Ex. LL,

27

Shead Dep. 83:5-21; Document #262-19, Ex. R, Guiley Dep. 61:4-14.  Others said that they did not physically rig the equipment or were not supposed to get dirty because of their role in interacting with the customer.  Document #262-7, Ex. F, Caffrey Dep. 33:6-8; Document #262-37, Ex. JJ, Ruiz Dep. 37:4-11; Document #262-35, Ex. HH, Roundtree Dep. 153:9-19; Document #262-8, Ex. G, Coffman Dep. 41:9-21.

In response to Frac Tech's evidence that the service supervisors are not similarly situated, the plaintiffs cite testimony of service supervisors who worked in different districts and asserted that their duties did not change from one district to another.  Document #303-2, Ex. 3, Bodily Dep. 56:18-23; Document #303-2, Ex. 4, Kelly Dep. Vol 2, 36:15-38:7; Document #303-2, Ex. 5, Ransom Dep. 34:14-20.  The plaintiffs also assert that service supervisors from one district would occasionally work specific jobs in other districts, which could indicate that the duties in the different districts were similar.  Document #303-2, Ex. 6, Roundtree Dep. 164:13-166:23.  The plaintiffs also point out that Frac Tech developed an internal checklist reflecting its views of the job duties of service supervisors.  The plaintiffs concede that some service supervisors did not use this checklist, but one service supervisor testified that the checklist looked similar to his duties.  Document #303-2, Ex. 7, Roundtree Dep. 193:24-195:9.  The plaintiffs describe a typical work day for a service supervisor: they began their mornings either by going to the yard or the job location, and if they went to the yard, they checked the board in the office for instructions.  Before leaving the yard, service supervisors would follow pre-convoy procedures, go over the route, ensure that equipment operators had performed inspections, and make sure they had any needed materials for the job.  Then, the plaintiffs say, service supervisors would lead the convoy to the job site.  Once there, service supervisors held safety meetings in which they discussed personal protective equipment.  They

28

would decide where the equipment was to be placed and would help set it up.  After that, the plaintiffs say, service supervisors were responsible for pumping the job and either stayed in the TCV monitoring the job or walked around the job to make sure everything was going well.  Once the job was complete, the service supervisor would fill out paperwork and obtain signatures from the client's representative, assist in rigging down the equipment, and then lead the crew back to the yard or to the next location.

Frac Tech counters by asserting that the testimony and other evidence about the duties of service supervisors offered in support of the decertification motion is inconsistent with or different from the plaintiffs' description of a service supervisor's typical day.  For example, one service supervisor testified that he did not just check the board but actually set it.  Document #262-10, Ex. I, Dunn Dep. 22:21-23:7.  Some service supervisors testified that they were not involved in equipment operators' pre-trip inspections.  *See supra* p. 25.  Some said they had no convoy responsibilities or organized the convoy.  *See supra* pp. 18-20, 26.  One said he had no responsibility for ensuring personal protective equipment was worn.  *See supra* p. 26.  Some said they were not required to ensure compliance with Department of Transportation regulations.  *See supra* p. 27.  Some said they were not responsible for holding convoy or safety meetings.  *See supra* pp. 18-19.  Some said they never or only occasionally assisted in rigging up or down and it was not part of their regular job duties.  *See supra* pp. 27-28.  Further, Frac Tech argues that, even if service supervisors performed similar activities, the evidence indicates that the service supervisors' authority and duties varied greatly.  Thus, Frac Tech asserts, the service supervisors cannot be similarly situated.  Finally, Frac Tech points out that, while a few service supervisors said that a service supervisor's job duties did not substantially vary from district to district, Sheedy, Jimerson, and Shead testified that there

29

were differences in a service supervisor's duties depending on the district.   Document #262-40, Ex. MM, Sheedy Dep. 24:1-10;  Document #262-26, Ex. Y, Jimerson Dep. 49:1-52:25 (noting differences and similarities between Longview and Conway districts); Document #262-39, Ex. LL, Shead Dep. 97:1-23.

### 2.    Application of the Law to the Evidence

#### i.    *The employment and factual settings of the plaintiffs.*

As the evidence above shows, the service supervisors' roles varied as to the amount of discretion and freedom from direct supervision they enjoyed over a wide variety of aspects of their job, including interviewing and hiring; training employees; monitoring and controlling employee hours and work time; directing, managing, or supervising the frac crews, equipment, and jobs; recommending changes in employment status; evaluating employees; disciplining employees; ensuring safety; and ensuring compliance with regulations. *See supra* Part II.A.1.  Some supervisors testified that they never did or were never required to do certain work that would constitute "management duties" as defined in 29 C.F.R. § 541.102.   Others admit that they performed management duties.  Of those who performed management duties, the evidence varies from service supervisor to supervisor as to which management duties were performed and to what extent.

According to Richard Reed, who worked as both a field engineer and a district engineer, "Frac Tech is extremely a fragmented organization.  There was no policy that I ever knew of that was the same in two different places. . . . [T]hings were so drastically different from district to district, even different regions."   Document #220-2, Ex. 28, Richard Reed Dep. 75:20-21, 76:17-18, August 9, 2010.  The evidence shows that Reed was correct.

30

Because of the fact-intensive nature of the exemption analysis, the variation in the job duties of the service supervisors weighs heavily against permitting the action to continue as a collective one. *See Heartland Auto. Servs.*, 404 F. Supp. 2d at 1152-53 (decertifying the class after finding significant disparities among plaintiffs regarding their ability to exercise discretion; perform management tasks; act independently of the direct superior; and control hiring, firing, and discipline); *Bunyan v. Spectrum Brands, Inc.*, No. 07CV0089MJR, 2008 WL 2959932, at *8-9 (S.D. Ill. July 31, 2008) (finding plaintiffs unable to meet the burden at the decertification stage where plaintiffs worked at different locations, on different shifts, and on different productions, and affidavit and deposition excerpts indicated differences in the tasks each individual performed).[8]

---

[8] The court in *Bunyan* also collected a number of district court opinions affirming the rule that "where a fact-specific analysis of each individual plaintiff's employment responsibilities would be required to determine their status, class certification is not appropriate[:]"

> *Reich v. Homier Distrib. Co.*, 362 F. Supp. 2d 1009, 1013-14 (N.D. Ind. 2005) (collecting cases and denying certification because "potential class members [are not] similarly situated where liability depend[s] on an individual determination of each employee's duties"); *Clausman v. Nortel Networks, Inc.*, No. 02-0400-C-M/S, 2003 WL 21314065, at *5 (S.D. Ind. May 1, 2003) (withdrawing certification because "members of [defendant's] sales staff performed their duties in a variety of ways, making individual inquiry necessary to determine whether each was properly classified," and "the factual inquiry necessary to make that determination weighs heavily against conditionally certifying a plaintiff class"); *see also Harris v. Fee Transp. Servs., Inc.*, No. Civ. A. 3:05CV0077-P, 2006 WL 1994586, at *5 (N.D. Tex. May 15, 2006) (collecting cases and noting that "multiple courts in this circuit and elsewhere have refused to conditionally certify a class at the first stage of the analysis when the determination of whether certain employees were improperly classified as exempt would require a highly individualized inquiry."); *Holt v. Rite Aid Corp.*, 333 F. Supp. 2d 1265, 1274-75 (N.D. Ala. 2004) (denying certification and finding that plaintiffs were not similarly situated because "the court would have to inquire . . . as to the daily tasks of each putative collective action member to determine whether they are similarly situated to the persons identified by the Plaintiffs, and then, on the merits, whether they had suffered an FLSA violation because they were not eligible for overtime compensation."); *Pfohl v. Farmers Ins. Grp.*, CV:3-3080 DT

ii.     *Defenses available to Frac Tech.*

The plaintiffs point out that Frac Tech has raised one common defense against all service supervisors, i.e., that they fall in one of the exemptions to FLSA overtime requirements.  From this, the plaintiffs conclude that there are no significant differences between the service supervisors regarding the defenses available to the defendant.  The plaintiffs suggest that this defense may be applied to or refuted by all service supervisors based on generalized testimony.  However, as discussed above, the service supervisor plaintiffs are not similarly situated on many of the fact-specific issues that must be addressed in determining if the executive exemption applies.  Whether a service supervisor is an exempt executive employee will depend on evidence that varies significantly among the service supervisors.  *See Heartland Auto. Servs.*, 404 F. Supp. 2d at 1154 ("[T]he finding that Plaintiffs are not similarly situated with respect to their factual and employment situations on material factual issues . . . create[s a] cumbersome defense issue[] that weigh[s] against certifying the class for collective action.").

iii.    *Considerations of fairness, procedure, and manageability.*

The plaintiffs argue that failing to permit them to proceed on a collective basis will work a hardship on the service supervisor plaintiffs and waste judicial resources since each service supervisor will have to re-file an individual case.  However, as the plaintiffs also note in arguing that decertification is inefficient, all of the service supervisor plaintiffs have been added as named

_____

(RCX), 2004 WL 554834, at *10 (C.D. Cal. Mar. 1, 2004) ("[T]he exempt or non-exempt status of hundreds of independent contractor adjusters would need to be determined on an employee-by-employee basis.  This would be inefficient and impractical, thereby defeating the purpose of a collective action.").

*Bunyan*, 2008 WL 2959932, at *9.

plaintiffs, so decertification would not require any plaintiffs to re-file their claims, and there is no risk that any of the service supervisors will find the courts closed to them.  The plaintiffs contend that decertification may result in varying outcomes, but there is evidence of significant differences regarding the duties of the service supervisors so it is no argument against decertification that the outcomes may vary.  To proceed as a class would be unfair to the service supervisors who testified that they performed no management duties because they would be joined in a class with the supervisors who testified that they performed management duties.  As noted above, Frac Tech has moved in the alternative for summary judgment on the claims of the service supervisors, and in that motion Frac Tech relies on testimony of a portion of the service supervisors as though their duties were typical of the class.  Were this case to go to trial as a class action, the risk would be great that some supervisors with meritorious claims would be prejudiced by being joined in a class with service supervisors who do not have meritorious claims.  The plaintiffs argue that some of the service supervisors suffered only minor damages and may not have the incentive to pursue individual litigation, but because the class was certified throughout the discovery period, the plaintiffs benefitted from discovery as to many of the relevant issues.  Finally, the plaintiffs argue that requiring multiple suits will exact a heavier toll on judicial resources, which lamentably is true but is not controlling.

Whatever merit these arguments have, because the Court has determined that service supervisor plaintiffs are not similarly situated with respect to many of the facts relevant to the key issues in the exemption analysis, decertification is necessary.  *Heartland Auto. Servs.*, 404 F. Supp. 2d at 1155 ("However, given the Court's determination that Plaintiffs are not similarly situated with

respect to key issues in the exemption analysis, the pursuit of individual actions is a necessary result.").

## Conclusion

Having weighed the factors and considered the evidence, the Court concludes that the services supervisor plaintiffs are not similarly situated and, therefore, the class of service supervisors must be decertified. The deposition testimony paints an entirely different picture regarding the similarity of the service supervisor's job duties and management authority than was presented by the affidavits submitted in support of initial certification. Frac Tech's motion to decertify the class of service supervisors is granted.

**B.** **MOTIONS FOR PARTIAL SUMMARY JUDGMENT AS TO THE CLASS OF SERVICE SUPERVISORS**

Because the class of service supervisors is decertified, the motions of both sides for partial summary judgment as to the claims of the class of service supervisors are denied as moot.

## III. MOTIONS REGARDING THE CLASS OF FIELD ENGINEERS

Frac Tech also has moved the Court to decertify the class of field engineers. The plaintiffs have moved for summary judgment on the issues of whether the class of field engineers is exempt from the overtime requirements of the FLSA.

**A.** **FRAC TECH'S MOTION TO DECERTIFY THE CLASS OF FIELD ENGINEERS**

Frac Tech contends that discovery has revealed numerous differences in the duties of the field engineers so that the class of field engineers must be decertified. The plaintiffs contend that the differences are not sufficient to warrant decertification. As will be explained, although the job duties of the field engineers varied somewhat, those variations are not material.

1.     **The Evidence**

Frac Tech asserts that the duties of the individual field engineers vary substantially.  Some field engineers testified that they provided technical support to the customers.  Document #267-34, Ex. GG, Steed Dep 75:8-19; Document #267-33, Ex. FF, David Smith Dep. 35:12-21; Document #267-13, Ex. L, N. Geer Dep. vol. 2, 19:15-23; Document #267-22, Ex. U, Clayton Lemons Dep. 29:11-30:4, August 20, 2010.  Other field engineers said that they did not.  Document #267-9, Ex. H, Davis Dep. 98:23-99:12; Document #267-7, Ex. F, Brown Dep. 40:15-22; Document #267-32, Ex. EE, Chad Smith Dep. 66:14-18, July 15, 2010.  Similarly, some field engineers made recommendations to customers.  Document #267-4, Ex. C, Bodily Dep. 30:20-22; Document #267-29, Ex. BB, Rowe Dep. 91:20-92:6; Document #267-31, Ex. DD, Shaw Dep. 77; Document #267-21, Ex. T, Jolley Dep. 56:18-57:18; Document #267-12, Ex. K, N. Geer Dep. vol. 1, 45:16-46:22; Document #267-22, Ex. U, Lemons Dep. 34:13-24.  Others did not.  Document #267-7, Ex. F, Brown Dep. 48:3-11; Document #267-23, Ex. V, Lyons Dep. 106:8-24; Document #267-34, Ex. GG, Steed Dep. 20:7-25; Document #267-30, Ex. CC, Ruiz Dep. 39:10-12; Document #267-15, Ex. N, Guiley Dep. 57:20-25; Document #267-20, Ex. S, Jimerson Dep. 69:13-15; Document #267-6, Ex. E, J. Borden Dep. 34:3-10; Document #267-25, Ex. X, Kristopher Mendel Dep. 17:19-24, July 29. 2010; Document #267-11, Ex. J, Gardner Dep. 27:22-24; Document #267-23, Ex. V, Lyons Dep. 23:16-23; Document #267-27, Ex. Z, Reed Dep. 11:16-18; Document #267-32, Ex. EE, Chad Smith Dep. 37:3-5.  Some field engineers indicated that they had management or supervisory functions. Document #267-26, Ex. Y, Osborn Dep. 104:8-13; Document #267-9, Ex. H, Davis Dep. 33:10-12, 72:6-19; Document #267-35, Ex. HH, Vinoles Dep. 49:6-50:12.  Some testified that they did not. Document #267-13, Ex. L, N. Geer Dep. vol. 2, 23:12-22; Document #267-25, Ex. X, Mendel Dep.

50:20-24; Document #267-23, Ex. V, Lyons Dep. 108:15-19; Document #267-32, Ex. EE, Chad

Smith Dep. 50:8-10, 66:5-13; Document #267-22, Ex. U, Lemons Dep. 51:24-52:5.   Some field

engineers said they assisted in preparing job proposals.   Document #267-19, Ex. R, Jackson Dep.

57:20-22; Document #267-26, Ex. Y, Osborn Dep. 60:2-5; Document #267-9, Ex. H, Davis Dep.

27:12-14; Document #267-16, Ex. O, Hanson Dep. 22:3-11.   Others did not.   Document #267-11,

Ex. J, Gardner Dep. 35:3-8; Document #267-27, Ex. Z, Reed Dep. 18:2-24; Document #267-32, Ex.

EE, Chad Smith Dep. 35:1-11; Document #267-3, Ex. B, Bison Dep. 28:15-22.   There is evidence

that some field engineers made changes to the job.   Document #267-29, Ex. BB, Rowe Dep. 91:11-

19; Document #267-16, Ex. O, Hanson Dep. 29:2-17.   However, one plaintiff testified that field

engineers did not suggest alterations to the job.   Document #267-20, Ex. S, Jimerson Dep. 69:13-15.

## 2. __Application of the Law to the Evidence__

The evidence upon which Frac Tech primarily relies shows that there is some variation in the

employment and factual settings of the different field engineers.   Frac Tech argues based on this

variation that the field engineers are not similarly situated.   As noted above, "to be similarly situated,

. . . class members need not be identically situated."   *Kautsch*, 504 F. Supp. 2d at 690.   As will

become apparent during the discussion of the plaintiffs' motion for partial summary judgment on

the issue of whether the class of field engineers is exempt from the overtime requirements of the

FLSA, the variations in the employment and factual settings ultimately are not material to the

disposition of their claims.   In all material respects, the field engineers are similarly situated.   The

defenses asserted by Frac Tech are the same with respect to each of the field engineers.   Moreover,

considerations of fairness and manageability support the conclusion that the class of field engineers

should not be decertified.

<u>Conclusion</u>

As stated, the field engineers are similarly situated in all material respects, so the Court will deny Frac Tech's motion to decertify the class of field engineers.

**B.    PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT AS TO THE CLASS OF FIELD ENGINEERS**

The plaintiffs move for partial summary judgment as to the class of field engineers and argue that, as a matter of law, field engineers are not exempt from the FLSA's overtime requirements.  Frac Tech argues that there are genuine issues of material fact as to whether field engineers are exempt as executive employees, administrative employees, or learned professionals.

**1.    <u>Executive Exemption</u>**

Regardless of whether the first three elements of the executive exemption are met, Frac Tech has failed to present evidence that any field engineer had the authority to hire or fire or that the suggestions and recommendations as to the hiring, firing, advancement, promotion or any other change of status of other employees of any field engineer were given particular weight.  Nicki Geer testified that she was not involved in hiring at Frac Tech.  Document #220-1, Ex. 18, N. Geer Dep. 23:23-24:3.  Clyde Osborn testified that he performed no evaluations.  Document #220-1, Ex. 19, Osborn Dep. 66:11-15.  David Gardner testified that he was not involved with interviewing, hiring, firing, recommending for promotion or termination, or evaluating employees.  Document #220-1, Ex. 4, Gardner Dep. 74:10-75:14.   Nicholas Lyons testified that he had no influence in hiring or firing anyone and never evaluated anyone.  Document #220-3, Ex. 48, Lyons Dep. 38:17-21.  Additionally, one Frac Tech internal document that stated field engineer responsibilities makes no reference to field engineers having responsibility for evaluating employees; making

recommendations about employees; or performing any other hiring, firing, or promotion functions. Document #220-1, Ex. 1, Bossier Field Engineer.

Frac Tech offers evidence that district engineers could, with management approval, terminate employees and could recommend employees for promotion. Document #280-36, Ex. II, Adrian Druba Aff. ¶¶ 3, 5, September 29, 2010. However, the plaintiffs do not seek damages for any period when a plaintiff was a district engineer or acted as a district engineer. Hence, this evidence is irrelevant to the present motion. Reed's resume states that he "[d]irected recruitment and retention of engineering staff." Document #280-27, Ex. Z, Resume. However, Reed was the district engineer in Odessa for the time period when he engaged in this management function, not a field engineer, so this resume entry is irrelevant. *Id.*; Document #280-27, Ex. Z, Reed Dep. 9:10-11. Because he was a district engineer in Odessa, Reed's testimony that he filled out some predetermined evaluations in Odessa is similarly irrelevant. Document #280-27, Ex. Z, Reed Dep. 29:15-18. Likewise, Kristopher Mendel's testimony that he did evaluations of three field engineers in McAlester is also irrelevant because Mendel was a district engineer in McAlester. Document #280-25, Ex. X, Mendel Dep. 28:3-8, 61:16-65:14.

Frac Tech offers David Dunn's testimony that he could make hiring and pay raise recommendations to the operations manager. Document #280-10, Ex. I, Dunn Dep. 55:20-56:1. However, later in his answer, Dunn stated that he was required to perform discipline as "supervisor, as of course, the role of district engineer or whatever, field coordinator[.]" Document #280-10, Ex. I, Dunn Dep. 56:18-20. This statement, along with the lack of any reference to his role as field engineer in his lengthy answer, indicates that Dunn's earlier comment about recommending new hires or pay raises did not refer to his role as field engineer but rather to the other positions that he

held.  Even if Dunn's testimony related to his work as a field engineer, his statement would not create a question of fact as to whether the fourth element of the executive exemption is met because Frac Tech has offered no evidence that Dunn's recommendations were given any particular weight.

Nicholas Lyons also testified that he could not recommend that employees be fired, but he admitted that he might have said to several people, including his boss, that an employee ought to be fired or that Lyons wished an employee would be fired.  Document #280-23, Ex. V, Lyons Dep. 116:9-24.  The standard is not whether the employee occasionally expressed his desire for another employee to be fired but whether the employee's recommendations were given particular weight. 29 C.F.R. § 541.100(a)(4). Occasionally expressing a desire or belief that an employee should be fired does not satisfy this standard.  Lyons also admitted that he once verbally recommended to his boss that an employee receive a pay raise.  Document #280-23, Ex. V, Lyons Dep. 111:18-112:23. However, there is no evidence indicating that Lyons's boss gave any weight to Lyons's recommendation or that the employee received a raise as a result of the recommendation.  Similarly, Lemons *once* recommended that a fluid technician be promoted or hired.  Document #280-22, Ex. U, Lemons Dep. 56:10-57:4.  As with Lyons' one recommendation, Lemons' single recommendation fails to create a genuine issue of fact regarding the fourth element of the executive exemption.

Frac Tech offers Reed's testimony that he met with potential employees after they were interviewed to speak about the job and explain duties.  Document #280-27, Ex. Z, Reed Dep. 50:3-24. However, Reed explains that these "interviews" were done only with potential employees whom management had decided to hire pending a background check.  *Id.*  This is not evidence of recommendations about hiring which are given particular weight.

Finally, Frac Tech cites the testimony of Dan Quick, who testified that field engineers were "involved in" the hiring or promotion of equipment operators to fluid technicians. Document #339-2, Ex. LL, Dan Quick Dep. 85:12-20, October 26, 2010. Even if a jury believed this testimony, the standard is not whether the field engineers were "involved in" the hiring or promotion of employees but whether the field engineers had the power to hire and fire or made recommendations about hiring or promoting employees that were given particular weight. Quick did not testify that field engineers could hire or promote employees or that their recommendations were given particular weight.

Frac Tech has the burden to come forward with evidence to create a genuine issue of material fact as to whether the fourth element of the executive exemption is met. *Thomas v. Speedway SuperAmerica, LLC*, 506 F.3d 496, 501 (6th Cir. 2007). Frac Tech has failed to meet this burden. Frac Tech has provided evidence that some field engineers may have made occasional recommendations regarding hiring, firing, or promotions, but no evidence that any of these recommendations were given any particular weight, were part of the field engineers' duties, were frequently made, or were frequently relied on. *See, e.g., Rock v. Sunbelt Cranes, Const. & Hauling, Inc.*, 678 F. Supp. 2d 1264, 1269-70 (M.D. Fla. 2009) (element not met where, though plaintiff has limited authority to fire employees and witness testified that he sought plaintiff's suggestions and recommendation regarding promotion, plaintiff infrequently exercised his power to hire or fire and his suggestions were not a considerable part of his job duties.).

Frac Tech has failed to create a genuine issue of material fact as to whether the fourth element of the executive exemption is met. Because the employer must establish each element of an exemption for that exemption to apply, and because Frac Tech cannot present evidence on the fourth element, it is unnecessary to consider whether Frac Tech can establish any other element.

2.    **Administrative Exemption**

Frac Tech also argues that the administrative exemption applies to the class of field engineers. Although Frac Tech has offered evidence that much of the work of field engineers is non-manual, the undisputed facts establish that the work of field engineers is not related to management or general business operations but to producing the service that Frac Tech provides. As noted above, to qualify as an administrative employee, "an employee must perform work directly related to assisting with the running or servicing of the business, as distinguished, for example, from working on a manufacturing production line or selling a product in a retail or service establishment." 29 C.F.R. § 541.201(a). Although there is some variation as to how the field engineers described their duties, all of them directly participated in the fracturing jobs, which is Frac Tech's principal service. Field engineers were responsible for making sure that the correct chemicals, sand, and water were onsite at the customer's well, and they went to each site and participated in the fracturing process. Their job, as Dan Quick described it, entailed making sure that the customer's needs were met before, during, and after the job. Document #339-2, Ex. LL, Quick Dep. 82:15-83:3.

The Second Circuit has explained, "we have drawn an important distinction between employees directly producing the good or service that is the primary output of a business and employees performing general administrative work applicable to the running of any business." *Davis v. J.P. Morgan Chase & Co.*, 587 F.3d 529, 535 (2d Cir. 2009). In *Davis*, the court held that the job of a loan underwriter fell under the category of production rather than administration. *Id.* Here, field engineers are directly involved in producing the good or service that is Frac Tech's primary output—well stimulation by means of hydraulic fracturing—rather than general administrative work applicable to the running of any business. *See also Reich v. New York*, 3 F.3d 581, 587-88 (2d Cir.

1993) (determining that state police investigators do not qualify for the administrative exemption because performing criminal investigations places "them squarely on the 'production' side of the line"), *overruled by implication on other grounds by Seminole Tribe v. Florida*, 517 U.S. 44, 59-66, 116 S. Ct. 1114, 134 L. Ed. 2d 252 (1996); *Martin v. Cooper Elec. Supply Co.*, 940 F.2d 896, 903 (3d Cir. 1991) ("[I]nside sales persons are production rather than administrative employees."); *Bratt v. County of Los Angeles*, 912 F.2d 1066, 1070 (9th Cir. 1990) (probation officers are not administrative employees because their job is to conduct the daily affairs of the employer); *Dalheim v. KDFW-TV*, 918 F.2d 1220, 1230-31 (5th Cir. 1990) (news producers for a television station are not administrative employees because their job duties relate to the production of the station's product, not to administering the business affairs of the enterprise).

Because Frac Tech cannot establish that the primary duty of field engineers directly relates to the *management* or *general business* operations of Frac Tech or Frac Tech's customers, the field engineers do not qualify for the administrative exemption, and it is unnecessary to address the other elements of the administrative exemption.

**3.     PROFESSIONAL EXEMPTION**

Frac Tech fails to present evidence creating a genuine issue of material fact regarding whether the position of field engineer requires "knowledge of an advanced type . . . customarily acquired by a prolonged course of specialized intellectual instruction." 29 C.F.R. § 541.300(a)(2)(i).

It is undisputed that only two of the fourteen field engineer plaintiffs hold degrees in engineering. Other field engineers hold degrees "in general studies, agricultural economics, history, science, and business finance." Document #221, Pls.' Statement of Undisputed Facts ¶ 115; Document #282, Def.'s Resp. to Statement of Undisputed Facts ¶ 115. Chad Smith has a degree in

physical education.  Document #280-32, Ex. EE, Chad Smith Dep. 9:5-9.  Tiki Davis has a bachelor's degree in communication and a master's degree in liberal arts.  Document #280-9, Ex. H, Davis Dep. 7:20-8:9.  Nicholas Lyons stated in his deposition that he has no college degree but completed a four-year electrical apprenticeship.  Document #280-23, Ex. V, Lyons Dep. 8:16-19, 100:10-14.  Clyde Osborn testified that he received a "certificate of completion in criminal justice" but never finished his degree.  Document #280-26, Ex. Y, Osborn Dep. 13:18-14:10.  Peter Hanson testified that he did not complete the requirements for his two-year degree.  Document #280-16, Ex. O, Hanson Dep. 6:4-8:12.  David Dunn had only a two-year degree.  Document #280-10, Ex. I, Dunn Dep. 7:12-20.  Thus, the undisputed facts establish that a field engineer at Frac Tech does not need "a prolonged course of specialized intellectual training."  29 C.F.R. § 541.301(a)(3).  Because most of the field engineer plaintiffs do not have an engineering degree or any other degree specific to the job of field engineer, the undisputed facts establish that "specialized academic training" in engineering or any other field is not "a standard prerequisite for entrance into the profession."  29 C.F.R. § 541.301(d).  This is not a case in which only with the occasional field engineer "attained the advanced knowledge through a combination of work experience and intellectual instruction." *Id.*  There is no degree requirement, or at least no common degree requirement, to be a field engineer at Frac Tech, nor is "specialized academic training" required to become a field engineer.  Indeed, the wide variety of degrees among the field engineers, the fact that more than a quarter of the field engineers lack bachelor degrees, and Lyons's testimony about his apprenticeship demonstrate that most field engineers have acquired their knowledge by experience, an apprenticeship, or general knowledge rather than by advanced specialized intellectual instruction.  *See id.*  "This is advanced knowledge 'from a general academics education and from an apprenticeship,' not from 'a prolonged

43

course of specialized intellectual instruction.' " *Fife v. Harmon*, 171 F.3d 1173, 1177 (8th Cir. 1999). Frac Tech has failed to create a genuine issue of material fact as to whether the elements of the professional exemption are met.

### 4.   <u>Willfulness</u>

The plaintiffs have also moved for summary judgment for the class of field engineers on the issue of whether Frac Tech willfully violated the overtime provisions of the FLSA. If Frac Tech willfully violated the overtime requirements of the FLSA, the period of limitations is three years, but if the violation was not willful, the period of limitation is two years. 29 U.S.C. § 255(a). An employer willfully violates the FLSA when it "either knew or showed reckless disregard for the matter of whether its conduct was prohibited by" the Act. *Young v. Cooper Cameron Corp.*, 586 F.3d 201, 207 (2nd Cir. 2009) (quoting *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 133, 108 S. Ct. 1677, 1681, 100 L. Ed. 2d 115 (1988)). Mere negligence is insufficient to establish willfulness. *Young*, 586 F.3d at 207. The burden is on the employee to show willfulness. *Id*.

In support of their argument that the Court should grant summary judgment on the issue of whether Frac Tech's violation was willful, the plaintiffs cite the testimony of Richard Reed, who said that when he was a district engineer, management made the decision to place the engineer who worked under him on a salary because they were paying him too much money in overtime as an hourly employee. The plaintiffs also contend that several salaried employees complained that they made less money than equipment operators who were paid on an hourly basis even though they worked longer hours. In addition, the plaintiffs cite the testimony of Tiki Davis, who complained that he was working at least 90 hours per week and getting paid less than he was paid before he was

promoted to the position of field engineer.  The plaintiffs contend that these facts demonstrate the willfulness of the defendant's conduct.

Suffice it to say that the Court does not agree that these facts establish as a matter of law that Frac Tech willfully violated the overtime provisions of the FLSA.  Whether Frac Tech acted willfully is an issue on which the plaintiffs have the burden of proof, and the inquiry into willfulness is heavily fact-driven.  *Moreno v. United States*, 82 Fed. Cl. 387, 397 (2008).  Thus, the state of mind of the decisionmakers at Frac Tech must be explored, and the Court must have an opportunity to assess the credibility of the persons who testify about that state of mind.  The Court cannot decide those issues at the summary judgment stage.  *Id*. at 398.  The evidence submitted by the plaintiffs in support of their claim that Frac Tech acted willfully is insufficient to establish as a matter of law that Frac Tech did so.  Therefore, to the extent that the plaintiffs move for summary judgment on the issue of whether Frac Tech's violation of the Fair Labor Standards Act was willful, the motion is denied.

## Conclusion

Frac Tech has failed to create a genuine issue of material fact as to whether the executive, administrative, or professional exemption applies to the class of field engineers.  As a matter of law, Frac Tech's field engineers are not exempt from the overtime requirements of the FLSA.  On the other hand, the plaintiffs have failed to show as a matter of law that Frac Tech's violation was willful, so that portion of the plaintiffs' motion for summary judgment is denied.

## IV.  MOTIONS REGARDING THE VARIOUS FIELD COORDINATORS

Frac Tech has moved for summary judgment as to the individual claims of David Dunn and Chris Giles as field coordinators.  The plaintiffs have moved for summary judgment as to the

individual claims of Patrick Berry, Jeff Davis, Chris Giles, Ken Martineau, and Jeffery Martinez,[9] as field coordinators.  The field coordinators have not been certified as a collective action, so the case of each field coordinator must be judged individually.  It is undisputed that the duties of field coordinators varied from district to district.

A.    **FRAC TECH'S MOTION FOR PARTIAL SUMMARY JUDGMENT AS TO THE CLAIMS OF DAVID DUNN AS A FIELD COORDINATOR**

Frac Tech has moved for summary judgment as to the claims of David Dunn as field coordinator[10] on the theory that, as a matter of law, Dunn in this capacity was exempt from the FLSA's overtime requirements under the executive exemption.  29 C.F.R. § 541.100.  Frac Tech offers portions of Dunn's deposition testimony and affidavit, the affidavit of a previous Frac Tech district manager, and Frac Tech's employee handbook to demonstrate that, while a field coordinator, Dunn had the primary duty of managing a frac crew.  Much of the evidence pertains to Dunn in his capacity as service supervisor.  However, Dunn also testified that, as a field coordinator, he had more responsibility than a service supervisor and that he was "in sole command of the crew."  Document #248-1, Ex. A, Dunn Dep. 57:17-23.  He said that he had authority to give an initial "yes" or "no"

_____

[9] The fifth amended and substituted complaint alleges that Jeffery Martinez was hired by Frac Tech in June 2007 as a service supervisor and held that position until his employment with Frac Tech ended in May 2009.  Document #202, Fifth Am. and Substituted Compl. ¶ 45.  The plaintiffs have moved for summary judgment on behalf of Jeffery Martinez, however, as a field coordinator.  The plaintiffs' statement of undisputed facts says that Jeffery Martinez worked as a field coordinator from October 30, 2007, to March 22, 2009.  Document #272, Pls.' Statement of Undisputed Facts ¶ 9.  Frac Tech has admitted that allegation.  Document #299, Def.'s Resp. to Statement of Undisputed Facts ¶ 9.  Because the parties agree that Jeffery Martinez was a field coordinator from October 30, 2007, until March 22, 2009, the Court will treat him as such despite the allegation in the complaint that he was a service supervisor during that period of time.

[10] Dunn also worked as a service supervisor and as a field engineer, and he has claims for overtime while working in all three capacities.

46

to employees' requests for time off; that he had the authority to give initial verbal and written warnings and even request probation; and that, although his managers sometimes overturned his suggestions regarding disciplinary actions, still "most of the time . . . they listen to us, because we know." Document #248-1, Ex. A, Dunn Dep. 58:16-19, 56:18-57:2, 61:13-22. The affidavit of Robert Buckbee states that field coordinators could execute disciplinary write-ups on service supervisors. Document #248-4, Ex. D, Robert Buckbee Aff. ¶¶ 5-6, September 28, 2010. That affidavit also says that the district manager relied on supervisors' evaluations and that these evaluations accounted for up to 75 percent of the decision to give pay raises. *Id.* Finally, Frac Tech's employee handbook says that supervisors can direct when an employee is to clock in, receive vacation requests, send an employee home, receive reports regarding injuries and other safety issues, deal with employee problems, evaluate job performance, and discipline subordinates. Document #248-8, Ex. H, Frac Tech Employee Handbook §§ 2.2, 3.2, 3.3, 4.1, 4.2, 4.3, 4.7, 4.8, 4.9, 4.19, 5.

On the other hand, Buckbee's affidavit states that field coordinators "on a job site were typically there to provide technical advice." Document #248-4, Ex. D, Buckbee Aff. ¶ 6. The service supervisors handled employee issues and "had ultimate authority over the job." *Id.* Dunn testified that field coordinators coordinated rather than supervised and were present on the job site to "help out where needed." Document #248-1, Ex. A, Dunn. Dep. 37:6-11. Dunn's declaration states that it was the service supervisors who "directed and controlled the equipment operators." Document #248-3, Ex. C, David Dunn Dec. ¶ 8, September 22, 2009. Moreover, it is unclear from the testimony whether Dunn's statements that he was in sole command of the crew and those regarding his involvement in initially granting time off to employees refer to his regular duties as field coordinator or his duties when occasionally filling in for service supervisors.

47

Frac Tech has presented some evidence that Dunn had management duties while employed as a field coordinator, but there is also contrary evidence indicating that field coordinators primarily acted as technical support on the job site and that the service supervisors had ultimate authority over the job and handled employee issues.  The Court cannot say as a matter of law that Dunn's primary duty as field coordinator was managing the frac crew.  Whether the executive exemption applies is highly fact specific.  Construing the evidence in a light most favorable to Dunn, there is a genuine issue of material fact as to whether Dunn's primary duty was managing the frac crew.

Similarly, the Court cannot say as a matter of law that, as a field coordinator, Dunn customarily and regularly directed the work of two or more other employees.  Evidence indicates that at some point Dunn was "over the service supervisors," and he testified that at some point he was in sole command of the crew.  Document #248-4, Ex. D, Buckbee Aff. ¶ 6; Document #248-1, Ex. A, Dunn Dep. 57:17-23.  However, as noted above, it is unclear whether Dunn's testimony refers to his regular duties as field coordinator or duties he took on while filling in for service supervisors.  Moreover, as noted, Dunn's district manager stated that service supervisors "had ultimate authority over the job" and that field coordinators typically acted as technical support on site.  Document #248-4, Ex. D, Buckbee Aff. ¶ 6.  Finally, Dunn's declaration avers that the service supervisors, rather than the field coordinators, "directed and controlled the equipment operators."  Document #248-3, Ex. C, Dunn Dec. ¶ 8.  Interpreted in the light most favorable to Dunn, a genuine issue of material fact exists as to whether Dunn as field coordinator customarily and regularly directed the work of two or more other employees.

As noted above, it is not clear from Dunn's deposition testimony whether he could make meaningful recommendations about discharging employees or granting pay increases in his capacity

as field coordinator, service supervisor, or both.  Further, the district manager's statement that evaluations accounted for 75 percent of his decision to grant a pay increase does not clearly refer to evaluations, if any, made by field coordinators because the district manager's statement is made immediately after the assertion: "Performance evaluations of equipment operators were performed by the service supervisors."  Document #248-4, Ex. D, Buckbee Aff. ¶ 5.  Hence, the Court cannot say as a matter of law that Dunn, as a field coordinator, had the authority to hire or fire other employees or that his suggestions and recommendations as to the hiring, firing, advancement, promotion or any other change of status of other employees were given particular weight.  Even if this element were met, summary judgment would not be appropriate because questions of fact remain for the second and third elements.

Issues of material fact exist as to whether Dunn as a field coordinator is exempt as an executive from the FLSA's overtime requirements.  Therefore, Frac Tech's motion for partial summary judgment as to the claims of David Dunn as field coordinator must be denied.

## B.  FRAC TECH'S MOTION FOR PARTIAL SUMMARY JUDGMENT AS TO THE CLAIMS OF CHRIS GILES AS A FIELD COORDINATOR

Frac Tech moves for summary judgment as to the claims of Chris Giles as field coordinator[11] on the theory that, as a matter of law, Chris Giles in this capacity was exempt from the FLSA's overtime requirements under the executive exemption.  29 C.F.R. § 541.100.  Frac Tech offers portions of Giles's deposition testimony and affidavit, the affidavit of a previous Frac Tech district manager, and Frac Tech's employee handbook to demonstrate that Giles, while a field coordinator,

---

[11] Giles also worked as a service supervisor and has a claim for overtime while working in that capacity.

had the primary duty of managing a frac crew.  Giles testified that, as a field coordinator,[12] he was assigned to one crew as the highest ranking Frac Tech employee on the job site whose duty was to "oversee, make sure that the supervisors and the operators were doing their job[,]" and act as the one "everyone is supposed to answer to before they make any phone calls to the yard."  Document #257-1, Ex. A, Giles Dep. 15:1-5, 21:23-22:5.  He stated that he would visit the job site ahead of the rest of the crew and the service supervisors to determine how to set up the equipment.  Document #257-1, Ex. A, Giles Dep. 15:23-16:10.  He directed the crew by showing them where he wanted the equipment and had two service supervisors under him.  Document #257-1, Ex. A, Giles Dep. 16:11-16, 19:17-19.  He stated that he spent his time either with the Frac Tech crew or setting up new job sites.[13]  Document #257-1, Ex. A, Giles Dep. 18:4-19.  He testified that he showed one employee what to do to be a service supervisor but noted that he did not know "if that's training."  Document #257-1, Ex. A, Giles Dep. 25:17-25.  Giles testified that when he was promoted to field coordinator from service supervisor his job did not really change.  Document #257-1, Ex. A, Giles Dep. 12:12-14.  Giles explained that as a service supervisor he was tasked with "making sure the job went fine and everything was safe" and that "everything was okay in the field on location."  Document #257-1, Ex. A, Giles Dep. 12:12-23.  Later, he admitted performing evaluations.  Document #257-1, Ex. A, Giles Dep. 23:3-24:12.

---

[12] Giles sometimes used the term "field supervisor," which he said was the same position as "field coordinator."  Document #257-1, Ex. A, Giles Dep. 11:22-24.

[13] Although this particular testimony is somewhat ambiguous, it appears that Giles testified that he spent about 30 hours per week setting up jobs and about 70-80 hours per week with the frac crews.  Document #257-1, Ex. A, Giles Dep. 18:4-19.

The affidavit of Giles's district manager states that field coordinators in Giles's district "have the primary duty of managing and coordinating the frac crews and their equipment," that service supervisors report to the field coordinator, that field coordinating requires "the use of discretion and judgment in order to complete the job," and that "95% of a field coordinator's time is spent in management and supervision of the frac crew." Document #257-6, Ex. F Andrew Mayfield Aff. ¶¶ 2-3, September 29, 2010. The district manager stated that field coordinators had disciplinary authority, that they were expected to provide disciplinary recommendations to the operations manager and district manager up to the point of termination or suspension, and that the recommendations were given great weight in making a final determination since the field coordinator was a person "with personal knowledge of the incident and of the employees overall work performance level." Document #257-6, Ex. F, Mayfield Aff. ¶¶ 4-5. Field coordinators were also expected to provide evaluations and recommendations as to promotions and pay raises, which served as "the primary basis" for determining whether or not an employee received a pay raise or promotion. Document #257-6, Ex. F, Mayfield Aff. ¶ 6.

Finally, Frac Tech cites its employee handbook, which states that supervisors can direct when an employee is to clock in, receive vacation requests, send an employee home, receive reports regarding injuries and other safety issues, deal with employee problems, evaluate job performance, and discipline subordinates. Document #257-5, Ex. E, Frac Tech Employee Handbook §§ 2.2, 3.2, 3.3, 4.1, 4.2, 4.3, 4.7, 4.8, 4.9, 4.19, 5.

In response, the plaintiffs offer almost no evidence to rebut Frac Tech's arguments. They do note that Giles testified that he could not write up an employee without authorization from the

operations manager or district manager.  Document #257-1, Ex. A, Giles Dep. 24:21-22.  However, Giles did not deny that he could made recommendations about employee discipline.

The undisputed facts establish that Giles had the primary duty of managing a frac crew.[14] The plaintiffs offer nothing to dispute the evidence that Giles was the highest Frac Tech employee on the job site who oversaw the job, the equipment, the employees, and the service supervisors, and who acted as the final authority on the job site to whom all employees had to come before calling the yard.  The undisputed facts establish that Giles spent most of his time supervising the crew and the rest setting up new jobs.  He directed employees and supervisors in performing the job.  The undisputed facts establish that Giles's most important function was to supervise the entire job and ensure that it ran well, that he spent most of his time supervising his assigned frac crew, and that he often acted free from supervision as the highest authority on the job site.  *See* 29 C.F.R. § 541.700(a) (factors to consider include "[1] the relative importance of the exempt duties as compared with other types of duties; [2] the amount of time spent performing exempt work; [3] the employee's relative freedom from direct supervision . . .");  *see also Nelson v. Ellerbe Beckert Constr. Servs.*, 283 F. Supp. 2d 1068, 1079 (D. Minn. 2003).  The plaintiffs failed to produce contrary evidence and no genuine issue of material fact remains.

Similarly, Frac Tech's evidence, both from Giles and his district manager, demonstrates that Giles primary job of supervising the frac crew on the job site included directing the work of the two service supervisors under him and the crew as a whole.  Again, the plaintiffs have presented nothing

---

[14] A frac crew was the group that performed the fracturing job.  Each crew was assigned a particular color.  Document #257-1, Ex. A, Giles Dep. 12:25.  Particular frac crews maintained the same supervisors.  Document #257-1, Ex. A, Giles Dep. 13:21-14:8.  The plaintiffs do not offer any conflicting evidence or otherwise contest Frac Tech's assertion that the frac crew is a recognized department or subdivision.

contradicting or disputing Frac Tech's evidence.  Thus, the undisputed facts show that Giles customarily and regularly directed the work of at least two employees.

It is undisputed that Giles did not have the authority to actually hire or fire an employee.  The undisputed facts show, however, that he had the power to recommend termination, promotions, and raises.  Further, his district manager's uncontested affidavit states that, as a field coordinator, he was expected to make these recommendations and that they were given great weight because he was out on the job and familiar with the employees and the factual circumstances of any incidents.  Lastly, Giles was expected to provide written evaluations of employees which were used in making determinations about promotions or raises.  The undisputed facts show that Giles's suggestions and recommendations as to the firing, advancement, or promotion or any other change of status of other employees were given particular weight.

For these reasons, Frac Tech is entitled to summary judgment on the claims of Chris Giles as field coordinator.

**C.**     **THE PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT AS TO THE INDIVIDUAL CLAIMS OF PATRICK BERRY, JEFF DAVIS, CHRIS GILES, KEN MARTINEAU, AND JEFFERY MARTINEZ AS FIELD COORDINATORS**

The plaintiffs have moved for partial summary judgment as to certain field coordinators arguing that, as a matter of law, Patrick Berry, Jeff Davis, Chris Giles, Ken Martineau, and Jeffery Martinez were not exempt from the FLSA's overtime requirements.  Frac Tech contends that there are genuine issues of material fact as to whether these field coordinators are exempt under either the executive exemption, the administrative exemption, or a combination.  Because the Court has granted Frac Tech's motion for partial summary judgment as to the claims of Chris Giles as field coordinator, the plaintiffs' motion for partial summary judgment must be denied as to Chris Giles.

The plaintiffs' motion as to the claims of the other individual field coordinators will be granted in part and denied in part.

### 1.  <u>Administrative Exemptions</u>

It is undisputed that the work of all of the field coordinators directly related to fracturing jobs, the primary output of Frac Tech, rather than to general administrative work applicable to the running of any business.  Consequently, for the reasons stated above in discussing field engineers, field coordinators are not covered by the administrative exemption.  *See* 29 C.F.R. § 541.201(a); *Davis*, 587 F.3d at 537.

Frac Tech attempts to avoid that conclusion by arguing that even though the field coordinators' jobs related directly to fracturing—the primary output of the company—that fact "does not equate them to persons working on a production line or selling a product in a retail store." Document #298, Def.'s Brief in Resp. to Pls.' Mot. for Partial Summ. J., p. 31.  That argument fundamentally misstates the import of section 541.201(a).  In *Dalheim*, the Fifth Circuit rejected a similar argument, saying that it "makes little sense" because the regulation "is not concerned with distinguishing between white collar and blue collar employees, or between service industries and manufacturing industries."  *Dalheim*, 918 F.2d at 1230.  Instead, the regulation distinguishes "between those employees whose primary duty is administering the business affairs of the enterprise from those whose primary duty is producing the commodity or commodities, whether goods or services, that the enterprise exists to product and market."  *Id.*

All of the field coordinators are entitled to partial summary judgment on Frac Tech's claim that they are exempt from the overtime requirement of the FLSA by virtue of the administrative exemption.

2.   **Executive Exemptions**

i.   ***Primary duty is management of the enterprise in which the employee is employed or of a customarily recognized department or subdivision thereof.***

The plaintiffs contend that the undisputed evidence establishes as a matter of law that Patrick Berry, Jeff Davis, Ken Martineau, and Jeffery Martinez, as field coordinators, did not have the primary duty of managing a frac crew.  The Court disagrees.

*(a)*   ***Patrick Berry***

The affidavit of Berry's district manager states that field coordinators have the primary duty of managing the frac crew and their equipment, dedicating ninety-five percent of their time on the job to this endeavor.  Document #297-10, Ex. I, Mayfield Aff. ¶¶ 2-3.  The affidavit states that field coordinators have disciplinary authority over subordinates and have the authority to recommend discipline up to termination or suspension.  Document #297-10, Ex. I, Mayfield Aff. ¶¶ 4-5.  Further, the field coordinators are expected to perform employee evaluations and to make recommendations as to promotions and pay raises.  *Id.*  These recommendations are given great weight and are the primary basis for determining if an employee is promoted or given a raise.  *Id.*  Further, the affidavit says that service supervisors, who head the frac crew, report to the field coordinator.  Document #297-10, Ex. I, Mayfield Aff. ¶ 2.  Berry testified that he was "really more in charge of the organizational."  Document #297-2, Ex. A, Patrick Berry Dep. 82:17-23, August 2, 2010.  He acknowledged that he was over multiple crews on a few occasions.  Document #297-2, Ex. A, Berry Dep. 82:24-83:1.  He stated that his job involved making sure the employees and equipment arrived on the job safely, were in working condition, and were ready to do a good job.  Document #297-2, Ex. A, Berry Dep. 36:17-23 .  Berry admitted that he participated in writing up and counseling employees.  Document #297-2, Ex. A, Berry Dep. 68:6-69:16, 73:5-81:16.  He signed employee

requests for time off from work.  Document #297-2, Ex. A, Berry Dep. 70:25-71:73:4.  Berry conceded that he may have shown employees how to rig up and rig down.  Document #297-2, Ex. A, Berry Dep. 85:6-14.  He also met with customers to verify that the proposals were error free and to work out rigging up issues.  Document #297-2, Ex. A, Berry Dep. 22:8-23:12.

A jury could conclude that Berry spent well over fifty percent of his time managing frac crews, that managing the crew and supervising was Berry's most important duty, and that he had the authority to evaluate and discipline employees, including the service supervisors.  There is evidence from which a jury could find that Berry was relatively free from direct supervision and was in charge of the job, having the broad goal of ensuring that the job was safely accomplished.

### *(b)* *Jeff Davis*

Similarly, there is a jury question as to whether Davis's primary duty was managing a frac crew.  Davis testified that his job included ensuring that the service supervisors were doing their job.  Document #297-3, Ex. B, Jeff Davis Dep. 34:18-21, 55:7-23; 58:4-7, August 16. 2010.  He told them what to expect based on pre-job inspections of the sites and assisted them with paperwork.  *Id.* He testified that he managed the employees assigned to his job.  Document #297-3, Ex. B, Davis Dep. 105:8-16.  He also stated that he set up locations and met with customer representatives. Document #297-3, Ex. B, Davis Dep. 55:22-26.  Davis ran two crews and had the authority to write up service supervisors.  Document #297-3, Ex. B, Davis Dep. 57:13-58:3, 63:13-16.  He evaluated employees and even discussed his expectations, as well as strengths and weaknesses, with service supervisors.  Document #297-3, Ex. B, Davis Dep. 55:7-11, 71:16-72:5.  Davis attended interviews and would even sit down with a prospective employee to evaluate whether he was a viable candidate. Document #297-3, Ex. B, Davis Dep. 105:17-106:23.  A district manager over Davis's district

testified that field coordinators were responsible for resolving problems and were on site for their experience and leadership abilities. Document #345-2, Ex. J, Quick Dep. 73:19-20, 68:20-23. He said that field coordinators trained service supervisors, were in charge of service supervisors, and evaluated and wrote up service supervisors. Document #345-2, Ex. J, Quick Dep. 69:17-21, 73:4-18. He asserted that field coordinators were responsible for job planning and inspecting locations. Document #345-2, Ex. J, Quick Dep. 72:22-25. Finally, he stated that field coordinators spent a majority of their time performing their duties on location. Document #345-2, Ex. J, Quick Dep. 79:23-80:2.

Based on this evidence, a reasonable jury could conclude that Berry spent a significant percentage of time performing management and supervisory functions. A jury reasonably could find that managing and supervising the crew was Davis's most important duty and that he had the authority to evaluate and discipline employees, including the service supervisors. There is evidence also from which a jury could conclude that Davis was relatively free from direct supervision, was in charge of the job, oversaw the service supervisors, and met with customers on his own.

### (c)   *Ken Martineau*

Martineau claimed on his resume that he was responsible for approximately 100 employees as well as equipment. Document #297-5, Ex. D, Resume. His resume states that he interfaced with customer representatives on the field regarding scheduling, job requirements, and client concerns. *Id.* According to his resume, he coordinated logistics and crew movement between locations and was responsible for documentation and job reports. *Id.* Finally, his resume states that he coordinated and directed the activities of subordinates and operators during rigging up and rigging down processes. *Id.* He testified that he was the top employee after the district and operations managers.

Document #297-5, Ex. D, Martineau Dep. 44:10-14.  Martineau stated that he signed employee requests for time off of work, although final approval had to come from the operations manager. Document #297-5, Ex. D, Martineau Dep. 52:14-53:13.  He admitted that he once granted an employee time off without first getting approval because his superior was on vacation.  Document #297-5, Ex. D, Martineau Dep. 68:23-69:6.  He verbally counseled employees about discipline on his own, could give written warnings on his own, and may have been able to give probation on his own.  Document #297-5, Ex. D, Martineau Dep. 50:24-52:13, 60:4-7.  He indicated that he had the power to send home employees who failed to wear proper personal protective equipment.  Document #297-5, Ex. D, Martineau Dep. 62:3-63:10.  He signed termination forms and told employees when they were fired, although he explains that he did not make the ultimate decision to terminate. Document #297-5, Ex. D, Martineau Dep. 44:15-25, 59:9-24, 64:17-68:22.  Finally, Martineau brought about fourteen employees with him when he came to Frac Tech.  Document #297-5, Ex. D, Martineau Dep. 14:18-24, 45:17-25.

Based on this evidence and considering the factors discussed above, a jury reasonably could find that Martineau's primary duty was managing a frac crew.

### *(d)     Jeffery Martinez*

While denying that he managed the frac crew, Martinez admitted that he "oversaw as to what they needed to be done."  Document #297-6, Ex. E, Jeffery Martinez Dep. 97:18-22, July 19, 2010. On his resume, Martinez stated that he was the "primary liaison" between Frac Tech and field representatives of the customer, correcting any issues which might arise.  Document #297-6, Ex. E, Resume.  He was responsible for turning the job "into reality on location."  *Id.*  He built and maintained relations with field consultants; was responsible for three frac crews; and had standard

duties that included finding locations, directing the crews to locations, and providing information to the crews to ensure that the job runs smoothly. *Id.* Martinez also claimed to be responsible for coordinating all logistics before a job was ready to begin and making sure the job ran smoothly. *Id.* A written evaluation of Martinez indicates that he trained a supervisor and sand king setters. Document #297, Ex. E, Employee Performance Evaluation. The evaluation says that he made recommendations regarding problems and had the primary task of managing the set-up of all jobs. *Id.* His district manager's affidavit states that field coordinators have authority over service supervisors. Document #297-9, Ex. H, Ronnie Fowler Aff. ¶ 3, September 30, 2010. The affidavit also says that field coordinators can execute disciplinary writeups and determine corrective action up to, but not including, termination so long as they discuss the decision with the district or operations manager. *Id.* The affidavit states that field coordinators are expected to provide recommendations regarding discipline since they have first hand knowledge of the incident. Document #297-9, Ex. H, Fowler Aff. ¶ 5. They are expected to perform evaluations and review them with the employees. Document #297-9, Ex. H, Fowler Aff. ¶ 6. Martinez admitted that he may have provided verbal evaluations of employees when asked by his superior. Document #297-6, Ex. E, Martinez Dep. 99:6-14. He also testified that he provided written evaluations of employees but asserted that these were typically done by the operations manager. Document #297-6, Ex. E, Martinez Dep. 72:10-74:5. Martinez also did some software training. Document #297-6, Ex. E, Martinez Dep. 99:21-100:3. A reasonable jury could find that Martinez's primary duty as field coordinator was managing frac crews.

### ii.     *Customarily and regularly directs the work of two or more other employees.*

The plaintiffs contend that the undisputed evidence establishes as a matter of law that Patrick Berry, Jeff Davis, Ken Martineau, and Jeffery Martinez, as field coordinators, did not customarily and regularly direct the work of two or more other employees or their equivalent.  The Court disagrees.

### (a)     *Patrick Berry*

As stated above, there is evidence that the service supervisors reported to Berry and that he had the primary duty of managing the frac crew.  Berry was over multiple crews from time to time.  His job included ensuring that "everything [was] going safely and designed to plan" and supervising the rigging up and rigging down process.  Document #297-2, Ex. A, Berry Dep. 41:13-18, 45:6-25, 50:1-7.  He said that he was constantly on the phone making calls to various employees, and even his superiors, telling them, "we need more of this."  *Id.*  A reasonable jury could find that Berry customarily and regularly directed the work of two or more full-time employees or their equivalent.

### (b)     *Jeff Davis*

As stated above, Davis testified that he ensured that the service supervisors were doing their job and told them what to expect based on pre-job inspections of the sites.  Further, he admitted that he managed the employees assigned to his job.  He also claimed that he set up locations and ran two crews.  Davis's district manager testified that field coordinators trained service supervisors and were responsible for ensuring that the service supervisors did their job when present on the site.  Document #345-2, Ex. J, Quick Dep. 72:17-21, 73:7-10.  A reasonable jury could find that Davis customarily and regularly directed at least two employees when managing or running the crews, supervising the service supervisors, or setting up the job locations.

### (c)   Ken Martineau

According to Martineau's resume, he was responsible for approximately 100 employees.  His resume indicates that he coordinated logistics, crew movement between locations, and the activities of subordinates and operators during rigging up and down processes.  He also claimed to be the top employee under the district and operations managers.  Martineau testified that on the job site the "guys would keep me informed as to what was going on" and said "my guys would come to me[.]"  Document #297-5, Ex. D, Martineau Dep. 13:17-14:6.  Interpreting the evidence in Frac Tech's favor, a reasonable jury could find that Martineau customarily and regularly directed the work of two or more full-time employees or their equivalent.

### (d)   Jeffrey Martinez

A reasonable jury also could find that Martinez customarily and regularly directed the work of two or more full time employees or their equivalent.  The evaluation of Martinez cited above indicates that he had the primary task of managing the set-up of all jobs.  While denying that he managed the frac crew, Martinez admitted that he "oversaw as to what they needed to be done."  Document #297-6, Ex. E, Martinez Dep. 97:18-22.  On his resume, Martinez stated that he was responsible for turning the job "into reality on location."  Document #297-6, Ex. E, Resume.  He testified that he was responsible for three frac crews.  He said that his standard duties included finding locations, directing crews to locations, and providing information to the crews to ensure that the jobs run smoothly.  Based on this evidence, a jury could find that Martinez directed employees in selecting a location, in setting up the location, and in ensuring the job was accomplished.

### iii. Authority to hire or fire, or whose suggestions and recommendations as to the hiring, firing, advancement, promotion or any other change of status of other employees are given particular weight.

Finally, the plaintiffs contend that the undisputed evidence establishes as a matter of law that Patrick Berry, Jeff Davis, Ken Martineau, and Jeffery Martinez, as field coordinators, did not have the power to hire or fire employees. The plaintiffs also claim that the field coordinators' suggestions or recommendations as to the hiring, firing, advancement, promotion or any other change of status of other employees were given no particular weight. The evidence indicates that none of the field coordinators had the authority to make ultimate hiring or termination decisions on their own. However, a jury question exists as to whether the individual field coordinators' suggestions and recommendations as to the hiring, firing, advancement, promotion, or any other change of status of other employees were given particular weight.

#### (a)   Patrick Berry

As noted above, Berry's district manager stated in an affidavit that field coordinators have the authority to recommend discipline up to termination or suspension and are expected to make recommendations as to promotions and pay raises. The affidavit states that these recommendations are given great weight and are the primary bases for determining if an employee is promoted or given a raise. A reasonable jury could find that Berry's position as field coordinator included the duty of performing evaluations and making recommendations, that Berry was required to regularly provide formal evaluations and keep his superiors apprised of issues with personnel, and that Berry's supervisors placed great weight on his evaluations and recommendations.

### (b)   *Jeff Davis*

As stated above, Davis testified that he attended but did not conduct interviews.  He said he would talk to prospective employees in the lobby and might suggest that his superiors consider certain candidates.  He stated that if a person approached him for a job he would initially sit down with the prospective employee to evaluate whether he was a viable candidate for a position and either would recommend him to his superiors or would give his application to a secretary if he was not interested.  Further, he admitted completing employee evaluations for the district manager.  Davis's district manager testified that field coordinators have input in hiring and firing.  Document #345-2, Ex. J, Quick Dep. 216:20-218:2.  He said that field coordinators evaluate and write up service supervisors and that these evaluations are given "significant weight" when making decisions about raises and promotions.  Document #345-2, Ex. J, Quick Dep. 73:4-13, 74:7-21.  The Frac Tech employee handbook states that merit increases are based on annual performance evaluations.  Hence, a jury could infer that Davis's evaluations affected pay raises.  Further, a reasonable jury could find that Davis's superiors gave particular weight to his suggestions and recommendations about prospective employees.

### (c)   *Ken Martineau*

Martineau said that he may have been able to give probation on his own.  He also signed termination forms and told employees that they were fired but did not make the ultimate decision to terminate.  Further, when he came to Frac Tech, Martineau brought approximately fourteen employees, all of whom were hired by Frac Tech.  Finally, he signed change of status forms for employees who were promoted, given a raise, transferred, or quit.  *See, e.g.*, Document #297-5, Ex. D, Martineau Dep. 43:11-18, 48:23-49:18, 51:14-18, 52:14-18, 53:7-20, 57:1-3, 57:21-58:13, 60:4-

10, 61:5-24, 65:7-10, 66:2-4, 67:8-13, 68:3-8, 68:23-69:8.  There is enough evidence to let a jury

decide whether the fourth element of the executive exemption is met as to Martineau.

*(d)*     ***Jeffery Martinez***

Finally, a fact question exists as to whether Martinez's suggestions and recommendations as

to the hiring, hiring, advancement, promotion or any other change of status of other employees were

given particular weight.   The affidavit of his district manager states that field coordinators can

execute disciplinary writeups and can determine corrective action up to but not including termination

so long as they discuss the decision with the district or operations manager.  The affidavit states that

field coordinators are expected to provide recommendations regarding discipline since they have

firsthand knowledge of the incident.   They are expected to perform evaluations.  As noted earlier,

there is evidence from which a reasonable jury could conclude that Martinez's written evaluations

were the primary basis for raises or promotions.

## Conclusion

Genuine issues of material fact exist as to whether the executive exemption applies to the

individual field coordinators (except Chris Giles).  No genuine issue of material fact exists as to

whether any of the field coordinators qualify for any other exemption.  Because field coordinators

directly participated in the fracturing jobs, they are production rather than administrative employees.

Because Frac Tech admits that these field coordinator plaintiffs were not exempt under the

professional exemption or the motor carrier exemption,[15] the Court grants partial summary judgment

in plaintiffs' favor regarding whether the class is exempt under the professional exemption or the

motor carrier exemption.   Document #299, Def.'s Resp. to Statement of Undisputed Facts ¶¶ 15,

---

[15] *See* 29 U.S.C. § 213(b)(1); 49 U.S.C. § 31502(b); 29 C.F.R. §§ 782.0-8.

145.  Because only one potential exemption applies, there is no basis for concluding that any of the field coordinators might meet the requirements of a combination exemption.  *See IntraComm, Inc. v. Bajaj*, 492 F.3d 285, 294 (4th Cir. 2007) (combination exemption requires the employer to establish independently each exemption to be combined).

## V.  FRAC TECH'S MOTION FOR PARTIAL SUMMARY JUDGMENT AS TO THE APPLICATION OF THE FLUCTUATING WORK WEEK METHOD

The Fair Labor Standards Act provides that nonexempt employees must be paid "at a rate not less than one and one-half times the regular rate at which he is employed" for all hours in excess of forty hours per week.  29 U.S.C. § 207(a)(1).  At issue is how to calculate "the regular rate."  Frac Tech has moved for partial summary judgment, arguing any damages should be calculated by the fluctuating work week method, which calculates the hourly rate of pay for an employee who is paid a salary and who works varying hours per week by dividing the weekly wage by the total number of hours that the employee worked in a given week rather than by forty.  *See Urnikis-Negro v. Am. Family Prop. Servs.*, 616 F.3d 665, 666 (7th Cir. 2010).  This calculation assumes that the salary is intended to compensate the employee for all of the hours worked rather than merely for forty hours. The fluctuating work week method thus reduces damages that an FLSA plaintiff may recover in two respects.  First, the regular rate of pay is reduced inasmuch as the hourly rate is determined by dividing the salary by total hours worked rather than by forty.  *Id*. at 672.  Secondly, assuming that the fixed weekly wage is compensation for all hours worked, including hours in excess of forty per week, the overtime rate is reduced from 150 percent of the regular rate to 50 percent of the regular rate.  *Id*.

The fluctuating work week method of calculating overtime derives from *Overnight Motor Transp. Co. v. Missel*, 316 U.S. 572, 62 S. Ct. 1216, 86 L. Ed. 2d 1682 (1942), *superseded on other*

*grounds by statute as stated in Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 128 n.22, 105 S. Ct. 613, 625 n.22, 83 L. Ed. 2d 523 (1985). Subsequent to the decision in *Missel*, the Department of Labor incorporated the fluctuating work week method into an interpretive bulletin. *See* 29 C.F.R. § 778.114. According to that interpretive bulletin, an employer can comply with the overtime requirements of 29 U.S.C. § 207(a) by paying overtime pursuant to the fluctuating work week method provided that the conditions specified in that interpretive bulletin are met.

The plaintiffs oppose Frac Tech's motion for partial summary judgment on the application of the fluctuating work week method on two grounds. First, the plaintiffs contend that Frac Tech cannot establish all of the requirements of 29 C.F.R. § 778.114 and therefore is not entitled to pay them pursuant to the fluctuating work week method. Secondly, the plaintiffs argue that the fluctuating work week method is an inappropriate method of calculating damages for employees who were misclassified as exempt from the overtime requirements of the FLSA.

Taking those arguments in reverse order, the Eighth Circuit has held that the fluctuating work week method is the correct method for calculating damages for employees who were misclassified as exempt from the overtime requirements of the FLSA. *See Yellow Transit Freightlines, Inc. v. Balven*, 320 F.2d 495, 499-500 (8th Cir. 1963) (holding that overtime should have been calculated by one-half rather than one and one-half at the regular rate for an employee who was misclassified as exempt pursuant to the motor carrier exemption in 29 U.S.C. § 213(b)(1)); *Anderson v. Fed. Cartridge Corp.*, 156 F.2d 681, 685 (8th Cir. 1946) (holding that the fluctuating work week method was the appropriate method for calculating overtime damages for employees misclassified as exempt pursuant to the executive or administrative exemptions); *Landreth v. Ford, Bacon & Davis, Inc.*, 147 F.2d 446, 448 (8th Cir. 1945) (applying the fluctuating work week method to an employee who was

misclassified as a supervisor). These decisions of the Eighth Circuit have not been overruled. They are binding precedent. Even if this Court believed that those cases would now be overruled by the Eighth Circuit, it would still be the duty of this Court to follow them until the Eighth Circuit itself or the Supreme Court overrules them.

But it is unlikely that these decisions of the Eighth Circuit will be overruled. The most recent and most thorough analysis by any court of appeals of the issues regarding the fluctuating work week method is the analysis of the Seventh Circuit in *Urnikis-Negro*. It has already been followed by two district courts in the Eighth Circuit. *Pressler v. FTS USA, LLC*, No. 4:09CV00676, 2010 WL 5105135 (E.D. Ark. Dec. 9, 2010); *Ahle v. Veracity Research Co.*, No. 09-0042, 2010 WL 3463513, at *18-19 (D. Minn. Aug. 25, 2010) ("The Seventh Circuit's decision methodically analyzes the competing arguments . . . . The Court adopts the reasoning set forth in *Urnikis-Negro*."). Other circuits also have held that the fluctuating work week method is the appropriate method for calculating damages in misclassification cases. *Rodriguez v. Farm Stores Groc., Inc.*, 518 F.3d 1259, 1268-69 (11th Cir. 2008) (holding that to calculate damages in a miscalculation case, the court should divide the salary by the number of hours the salary was intended to cover); *Valerio v. Putman Assocs., Inc.*, 173 F.3d 35, 39-40 (1st Cir. 1999) (applying the fluctuating work week method to the damage claim of an employee misclassified as an administrative employee); *Blackmon v. Brookshire Groc. Co.*, 835 F.2d 1135, 1138-39 (5th Cir. 1988) (applying the fluctuating work week method to the damage claims of employees misclassified as executive or administrative); *Crawford Prod. Co. v. Bearden*, 272 F.2d 100, 105 (10th Cir. 1959) (holding that the salary was to cover all hours actually worked even though the work week fluctuated, so the fluctuating work week method calculating overtime should apply).

As to the plaintiffs' argument that the Court should not calculate damages using the fluctuating work week method because Frac Tech did not comply with all conditions of 29 C.F.R. § 778.114, the Seventh Circuit explained in *Urnikis-Negro* that section 778.114(a) does not apply to a claim for damages and is not the source of the authority for calculating damages based on the fluctuating work week method.   616 F.3d at 675-79.[16]   Rather, the source of the authority for calculating damages based on the fluctuating work week method is the decision of the Supreme Court in *Missel*.  *Id.* at 681.  The factual issue with respect to whether the plaintiffs' damages should be calculated using the fluctuating work week method is whether the salary was intended to compensate for all hours worked or only for forty hours.  *Id*.  Here, all of the evidence indicates that the salaries of the plaintiffs were intended to compensate them for all of the hours that they worked.  Each plaintiff understood that the hours to be worked would fluctuate from week to week.  Each plaintiff worked more than forty hours per week and accepted the salary as compensation for the hours worked.[17]   Consequently, as a matter of law, the proper method of calculating damages is the fluctuating work week method.  So far as the evidence before the Court indicates, each plaintiff agreed to work for a fixed salary for all hours worked.

---

[16] Frac Tech contends that it can satisfy all of the elements of section 778.114(a). Because that section does not apply to the issue before the Court, the Court will not reach the issue of whether Frac Tech can satisfy all of the elements of that interpretive bulletin.

[17] There is evidence that some or all of the plaintiffs received discretionary bonuses from time to time, but there is no evidence that Frac Tech was contractually obligated to pay bonuses.

# VI.  OTHER MOTIONS

## A.   FRAC TECH'S MOTION TO SEVER

Frac Tech has also filed a motion to sever the claims of the various plaintiffs for trial.  The plaintiffs have responded and have stated that the claims should not be severed because there is no reason to have fifty-nine trials in this case.  The motion to sever is premature.  Now that the Court has resolved the motions for summary judgment that were pending, the parties should confer in good faith to see if they can agree on a plan whereby the cases can be tried in a manner that is efficient and fair to all.

Because the Court has denied the motion to decertify the field engineers and has granted summary judgment to the class of field engineers on the issue of whether they are exempt from the overtime requirements of the FLSA, it will be necessary to have a trial on damages for the field engineers as a class.  Only one trial will be needed for the class of field engineers.

With respect to the remaining plaintiffs, it may be possible to select a group of representative plaintiffs and proceed to trial on those cases after which the others might be resolved; it may be possible to divide the plaintiffs into groups according to the districts in which they worked or on some other logical basis that would permit the Court to try the claims of several plaintiffs in one trial; or it may be possible to develop some other plan that would permit the cases to be tried fairly and efficiently.

The parties should confer in good faith to see if they can agree on a method for trying the cases and submit a joint report to the Court, if possible, within thirty days of entry of this Opinion and Order.  If the parties cannot agree on a case management plan, they may submit separate

69

proposals.  The Court will schedule a Rule 16 conference to discuss a case management plan.

Accordingly, the motion to sever is denied at this time.  Document #260.

**B.**     **PLAINTIFFS' MOTION IN LIMINE**

The plaintiffs have filed an extensive motion in limine seeking to exclude from evidence a series of items relating to 52 of the plaintiffs.  Frac Tech has responded and does not object to portions of the motion in limine.  Without objection, the motion in limine is granted as to the following items:

(a) Plaintiffs' testimony related to hearing about and learning about the current lawsuit, with whom Plaintiffs discussed joining the lawsuit, and when Plaintiffs contacted a lawyer;

(b) Plaintiffs' testimony related to their bankruptcies, social security disability claims, unemployment claims, workers' compensation claims, and prior litigation history (except Ken Martineau's FLSA lawsuit against Cudd Energy Services);

(c) Plaintiffs' testimony related to divorces, child custody, and child support obligations (except the fact that Plaintiffs Dallas Bodily and Nicki Geer are engaged);

(d) Plaintiffs' involvement in car wrecks;

(e) Plaintiffs' drug and alcohol problems;

(f) Plaintiffs' experiences regarding termination and layoff with other employers;

(g) Any accidents that Plaintiffs may have been involved in while employed at places other than Frac Tech;

(h) Plaintiffs' prior arrests or convictions within the past ten years (except Adams's conviction for a bad check, Hernandez's misdemeanor theft by check, Huber's DUI convictions, Smith's first degree assault, Thomas's felony of unauthorized entrance, and Shaw's felony drug possession and incarceration); and

(i) Any convictions where more than ten years elapsed since the date of conviction or release from confinement (except Shead's felony conviction for theft by check which resulted in his release from incarceration in 2000).

Over Frac Tech's objection, the following items of evidence are excluded as irrelevant or as unfairly prejudicial:

(a) Whether any plaintiff had a commercial driver's license;

(b) Whether any plaintiff was fired or terminated from employment at Frac Tech except insofar as the basis for the firing or termination constitutes evidence as to whether the job duties of that particular plaintiff made him or her exempt from the overtime requirements of the FLSA;

(c) The fact that Ken Martineau has an FLSA suit against another company;

(d) The fact that Dallas Bodily and Nicki Geer are engaged;

(e) The fact that some of the plaintiffs used company cell phones for personal telephone calls;

(f) The job duties of the various plaintiffs at places of employment other than Frac Tech;

(g) The misdemeanor conviction in 2003 of Tejon Adams for writing a bad check;

(h) The conviction of Eduardo Hernandez for theft by check;

(i) The conviction of Jimmy Huber for DWI;

(j) The conviction of Chad Smith for first degree sexual assault;

(k) The conviction of Marcus Thomas for felony of unauthorized entrance; and

(l) The conviction of Greg Shaw for felony drug possession.

As to items (g) through (l), Rule 609(a)(1) of the Federal Rules of Evidence provides that for the purpose of attacking the truthfulness of a witness, evidence that the witness has been convicted of a crime shall be admitted, subject to Rule 403, if the crime was punishable by imprisonment in excess of one year. Rule 609(b) provides that evidence of a conviction is not admissible if more than ten years has elapsed since the date of the conviction or the release of the witness from the confinement imposed for that conviction, whichever is later. Here, some of the convictions that the

71

Court are excluding relate to minor acts of dishonesty that occurred several years before.  The Court concludes that the probative value of those convictions is substantially outweighed by the danger of unfair prejudice.  Other convictions are more recent but do not relate to dishonesty, and the Court concludes that the probative value of those convictions is substantially outweighed by the danger of unfair prejudice.

Other than as mentioned above, the motion in limine is denied without prejudice to the right of the plaintiffs to object at trial.  The motion in limine is thus granted in part and denied in part. Document #323.

### C.   PLAINTIFFS' MOTION TO COMPEL

The plaintiffs filed a motion to compel but have now notified the Court that the matter has been resolved.  Therefore, the motion to compel is denied as moot.

### D.   FRAC TECH'S MOTION TO STRIKE

Frac Tech moved to strike certain exhibits submitted by the plaintiffs that Frac Tech contends contained erroneous information.  The Court has not considered any of the information that Frac Tech argued was erroneous, so that motion is denied as moot.  Document #352.

## CONCLUSION

For the reasons stated above, plaintiffs' motion for partial summary judgment for field engineers is granted in part and denied in part (Document #219); plaintiffs' motion for partial summary judgment for service supervisors is denied as moot (Document #223); Frac Tech's motion for partial summary judgment as to the application of the fluctuating work week is granted (Document #237); plaintiffs' motion to compel is denied (Document #243); Frac Tech's motion for partial summary judgment as to the claims of David Dunn as field coordinator is denied (Document

#248); Frac Tech's motion for partial summary judgment as to the claims of Chris Giles as field coordinator is granted (Document #257); Frac Tech's motion to sever is denied at this time (Document #260); Frac Tech's motion to decertify the class of service supervisors is granted (Document #262); Frac Tech's motion for partial summary judgment regarding service supervisors is denied as moot (Document #264); Frac Tech's motion to decertify the class of field engineers is denied (Document #267); plaintiffs' motion for partial summary judgment on the claims of certain field coordinators is granted in part and denied in part (Document #270); plaintiffs' motion in limine is granted in part and denied in part (Document #323); Frac Tech's supplemental motion for partial summary judgment regarding service supervisors is denied as moot (Document #342); and Frac Tech's motion to strike is denied as moot (Document #352).

IT IS SO ORDERED this 11th day of January, 2011.


J. LEON HOLMES
UNITED STATES DISTRICT JUDGE